FILED
4/24/2023 12:43 PM
Kelly Ashmore
District Clerk
Grayson County

CAUSE NO. CV-23-0514 _____



| | |
|---|---|
| DEBRA VEALE, individually and on behalf of all others similarly situated, | § § § |
| _Plaintiff,_ | § § |
| | § § |
| v. | § § |
| JEFFERSON NATIONAL LIFE INSURANCE COMPANY, | § § § |
| _Defendant._ | § § |

IN THE DISTRICT COURT OF

GRAYSON COUNTY, TEXAS

Grayson County - 59th District Court

____ JUDICIAL DISTRICT

---

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Debra Veale, individually and on behalf of all others similarly situated, files this Original Petition, stating as follows:

### DISCOVERY CONTROL PLAN

1.    Counsel for Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure ("TRCP") 190.4.

### STATEMENT OF CLAIM FOR RELIEF

2.    Pursuant to TRCP 47, and while reserving all rights to recover a greater amount as shown by the evidence, this suit initially seeks individual monetary relief over $250,000 but not more than $1 million. Absent discovery, the potential amount in controversy on a class basis is not known to Plaintiff.

### PARTIES

3.    Plaintiff Debra Veale is an individual residing in Sherman, Texas.

4.    Defendant Jefferson National Life Insurance Company ("JNLIC") is a Texas-chartered insurance company that designates Dallas as its domicile city with

the Texas Department of Insurance, and Corporation Service Company at 211 E.

7th St, Ste 620, Austin, Texas 78701, as its registered agent for service of process.

## VENUE AND JURISDICTION

5.     Venue is proper because this is a suit against a life, accident, or health-insurance company and Grayson County is where the policyholder resided when the cause of action accrued. *See* TEX. CIV. PRAC. & REM. CODE § 15.032.

6.     The damages sought are within the jurisdictional limits of this Court.

7.     This Court has personal jurisdiction over JNLIC because it is chartered in Texas and regularly conducts and/or solicits business in, engages in other courses of conduct in, and/or derives revenue from persons in Texas. JNLIC has engaged, and continues to engage, in substantial and continuous business practices in and subject to the laws of the State of Texas.

## FACTS

### A.  THE CANCER POLICIES AT ISSUE

8.     Since at least 1988, JNLIC's predecessor, Great American Reserve Insurance Company, sold guaranteed renewable cancer policies nationwide—from Dallas, Texas—that were issued as Form 22-9001 (09-88) (the "Policy").[1]

9.     The Policy was prominently marketed as "THE CANCER FIGHTER," with accompanying statements creating a reasonable expectation that significant

---

[1] The class action is intended to encompass that policy issued as Form 22-9001 (09-88) and all other cancer treatment policies owned or administered by JNLIC that do not explicitly limit a payment of benefits to amounts owned after other insurance or payors have compensated a provider or adjusted a bill and, thus, the term "Policy" as used throughout shall also include all such other similar policies.

cash benefits would be paid if a covered person ever got cancer, as seen in the following type of brochure that was used at the time:



10. The Policy and others like it were advertised as broadly covering all "treatment" and "expenses" for cancer.

11. Indeed, the cover page of the Policy itself states: "We promise to pay the benefits described in this policy if any Insured Person ... incurs expenses, requires treatment, or otherwise suffers a covered loss as a result of cancer ...."

12. In 1990, the Great American Reserve Insurance Company was acquired by an affiliate of Conseco, Inc. (part of the CNO Financial Group). The named insurer on the Policies then became Conseco Variable Life Insurance Company,[2] which in 2003 changed its name to JNLIC.

13. Nationwide Insurance or one of its affiliates then acquired the family of entities that includes JNLIC in or around 2016.

## B. THERE ARE FIVE CATEGORIES OF BENEFITS IN THE POLICY

14. The benefits provided by the Policy and others like it administered by JNLIC can be grouped into five general areas: diagnosis, hospital confinement, treatment, transportation, and other care.

### (i) Diagnosis Benefits

15. The Policy first is supposed to pay cash in three different ways based on a diagnosis of cancer,[3] which can be summarized as follows:

  a. "Initial Diagnosis Benefit" – a $1,500 lump sum payable after the named insured person is diagnosed with cancer (or half that, $750, for an insured's dependent).

  b. "Cumulative First Occurrence Benefit" – an additional lump sum calculated at $30 per month (or half that, $15

---

[2] That entity was originally known as "Union Life Insurance Company."

[3] The only type of cancer not covered by the Policy is "skin cancer." References to "cancer" in this pleading therefore do not include skin cancer.

per month, for a dependent) for each full month that coverage was in force "after the waiting period"[4] until the date of diagnosis or age 65, whichever is sooner.

c. "<u>Positive Diagnostic Test Benefit</u>" – the cost of lab tests, including x-rays, that show a positive diagnosis of cancer at any time, capped however at a $300 lifetime maximum.

16.    The Initial Diagnosis and Cumulative First Occurrence benefits are paid once with respect to a particular cancer in each insured person.

### (ii)  Hospital Confinement Benefits

17.    Next, if an insured person (policyholder or covered dependent) is admitted to a hospital as a result of cancer, then the holder of the policy is entitled to be paid benefits summarized as follows:

a. "<u>Hospital Confinement Benefit</u>" – a daily rate for overnight stays as set forth in a schedule (e.g., $200 per day for the first 70 days; $400 per day thereafter).

b. "<u>Prescription Drugs and Medicines Benefit</u>" – the charges for prescription drugs and medicines administered during a hospital confinement, capped at $50 per day.

c. "<u>Attending Physician Benefit</u>" – the cost for visits by a doctor other than a surgeon, capped at $30 per day.

d. "<u>Nursing Services Benefit</u>" – the cost of private nursing care (meaning nurses not employed by the facility) during hospital confinement, capped at $180 per day.

### (iii)  Treatment Benefits

18.    The Policy separately pays cash for cancer treatment, regardless of whether it occurs in or out of a hospital, as follows:

---

[4] The "waiting period" was eliminated in this respect by an amendatory endorsement—Form 22-7120 (01/90)—that was issued in 1990.

a.  "Surgical Benefit" – the fees charged for an operation performed for treatment of cancer, subject to a maximum per type of surgery as listed in a separate surgical schedule (e.g., $1,300 for a pancreatectomy, also known as a surgery to remove all or part of the pancreas) and then further multiplied by a "surgical factor" (e.g., 2.0) that is found in the main Policy schedule.

b.  "Anesthesia Benefit" – the costs of an anesthesiologist for a covered surgery, but limited to a maximum of 25% of the applicable Surgical Benefit to which it relates.

c.  "Blood, Plasma, and Platelets Benefit" – the costs of blood, plasma, and platelets at any time, with no maximum.

d.  "Prosthesis Benefit" – the cost of prosthetic devices required as a result of surgery, capped at a $1,000 lifetime maximum.

e.  "Radiation, Chemotherapy, and Immunotherapy Benefit" – the "actual cost incurred" if receiving for the treatment of cancer any of the following types of therapies, stated in the Policy verbatim as:

   ▪  teleradiotherapy using either natural or artificially propagated radiation;

   ▪  interstitial or intracavity application of radium or radioisotopes in sealed or non-sealed sources; or

   ▪  cancericidal (cytotoxic) chemical substances to include the administration thereof.

### (iv)  *Transportation Benefits*

19.    In addition, the Policy pays cash for certain transportation and lodging expenses incurred due to cancer that can be summarized as follows:

a.  "Ambulance Benefit" – the cost of air or ground ambulance transportation to a hospital for treatment of cancer, subject to maximums per period of confinement.

b.  "Transportation Benefit" – the costs of transportation by either private vehicle or a common carrier to and from a

        facility (not just a hospital) for treatment of cancer, if it is more than 50 miles from the person's residence but also capped for private transportation at the lesser of either $0.40 per mile or $350 per round trip.

    c.    "Family Member Lodging Benefit" – the cost of a single room of lodging for a family member to stay near where the patient is confined to a hospital, provided the location is more than 50 miles from the person's home and subject further to maximums per day and period of confinement.

### (v) Other Care Benefits

20.    Finally, the Policy pays benefits for "extended facility" or "hospice" care related to cancer, each subject to their own daily maximums.

### C. ANY "OTHER INSURANCE" IS IRRELEVANT TO THE POLICY

21.    The Policy requires that JNLIC pay cash benefits "immediately" upon proof an insured (or their family member if applicable) was diagnosed with cancer or received a covered treatment, care, or other matters triggering a benefit.

22.    The sole limitations and exclusions on that obligation to pay are that:

    a.    Benefits get paid only for matters that are "as a result of" cancer (to include "treatment" thereof);

    b.    There is a 30-day waiting period in which benefits are not paid if cancer is first diagnosed in that time; and

    c.    Benefits are not paid in relation to charitable or other facilities that provide gratuitous or free services, stated in the Policy as: "… no benefits will be paid under this policy unless a legal liability exists for the payment of expenses incurred for the treatment or services rendered."

23.    Nothing in the Policy requires actual payment for services be made by an insured or other person as opposed to the patient merely incurring an expense.

24.    Further, nothing in the Policy refers to other insurance or limits the payment of benefits to only that portion of expenses a patient may owe or pay themselves after their primary health insurance plan is applied, or otherwise.

25.    The risk insured against for which cash benefits are payable is simply getting cancer and/or receiving treatment for which expenses are incurred; not whether the patient can or cannot pay or whether a provider is or is not paid.

26.    As a result, the Policy is not what may be referred to as an "excess" or "gap" health insurance plan, which in general typically makes payments directly to a provider to cover only what remains unpaid by a patient after their primary health insurance or government benefit (i.e., Medicare/Medicaid) are applied.

27.    JNLIC's Policy instead pays cash directly to a policyholder (who need not be the patient at all, since a dependent can be covered) when a triggering event occurs with no restrictions on the policyholder's use of such cash benefits and without regard to whether other insurance exists or a provider is ever paid.

## D. THE POLICY IS KNOWINGLY AND/OR INTENTIONALLY MISAPPLIED BY JNLIC

28.    Despite the direct cash benefits nature of the Policy, JNLIC interprets language in it referring to the costs charged to a patient—such as "actual incurred cost" or a "legal liability" for expenses—*against* policyholders in a way that systematically denies and/or underpays claims when there is other insurance.

29.    That is a false, deceptive, and bad faith tactic that JNLIC uses to deceive, mislead, confuse, and avoid or delay paying benefits to policyholders.

30.    JNLIC is aware of the duty to act in good faith and deal fairly with policyholders, and aware that ambiguous terms are construed in their favor.

31.    Further, it is anticipated discovery will reveal JNLIC has received prior complaints—directly and/or through state insurance regulators and other sources—about its improper interpretations and others described herein.

32.    It is further anticipated that discovery will reveal JNLIC (itself and/or through its predecessors) did not always interpret or apply the cancer policies in these ways, but rather started doing so as a means to increase profit or cut costs.

33.    JNLIC thus knowingly and intentionally engages in false, deceptive, misleading, bad faith, and unfair conduct towards the holders of cancer policies.

34.    JNLIC's conduct is carried out on a uniform basis through its (and/or its affiliates') corporate policies, practices, and procedures.

**D.  JNLIC'S CLAIMS PROCESS IS ALSO DESIGNED TO DELAY AND DENY**

35.    When a person seeks benefits under a cancer policy administered by JNLIC, they face an arduous road ahead designed to weed out as many claims as possible, without regard to validity, simply by making it unnecessarily burdensome nearly every step of the way to get a claim fully submitted and processed.

36.    To start, there is no website or other convenient way for a policyholder (or their family, friends, or caregivers if a policyholder is the one battling cancer) to determine who to contact or where to submit a claim, nor to find the forms to complete up front to minimize processing delay, which is not industry standard.

37.    For those able to figure what number to call, JNLIC then directs them first through foreign call centers—staffed with persons who do not speak English in a familiar way and that have only rudimentary information about the Policy or its benefits—to field inquiries. It can take hours on the phone to get through, if ever, to someone based in the United States with any real knowledge.

38.    A policyholder is then sent forms by mail only that require several more submissions before a claim will be considered, including: a physician's statement, medical report, and authorization for JNLIC to obtain information from:

> "… any licensed physician, medical practitioner, pharmacist, hospital, clinic, other medical or medically related facility, federal, state or local government agency, insurance or reinsuring company, consumer reporting agency or employer having information available as to diagnosis, treatment and prognosis with respect to any physical or mental condition and/or treatment of [the policyholder or dependent], and any non-medical information about [the policyholder or dependent]."

(the "HIPAA Authorization"). Yet, as noted further below, JNLIC never actually intends to use such authorization to help a claimant obtain benefits (as opposed to challenge them); it is just another burden for a claimant to meet to submit a claim.

39.    That is the process merely to get started for diagnosis benefits as well; it becomes increasingly more difficult if seeking other benefits under a policy.

40.    For example, after providing a doctor or hospital bill for cancer therapy (i.e., radiation, chemotherapy, or immunotherapy) or other benefits that are based on cost, JNLIC takes its time to process then mail a letter back stating the claimant must submit an explanation of benefits ("EOBs") from other insurance providers

(with the only option offered being by mail in printed format, with postage and other associated costs of obtaining, copying, and mailing materials).

41.    That JNLIC does even though nothing in the Policy refers to other insurance or payors, thereby inappropriately increasing the costs of submitting materials and delaying the processing of a claim and, otherwise, ending all investigation and denying a claim if other insurance EOBs are not provided.

42.    In addition, if the claim involves surgery, a hospital stay, attending physician visits, or related matters, then JNLIC mails a further letter—only after the previous iteration sent to request EOBs, to create further delay and opportunity to deny a claim if not provided—that requires abstruse forms and documents be gathered and submitted for a claim to be processed, such as:

- "UB-04"
- "CMS-1500"
- Operative reports

43.    Policyholders are not familiar with those materials and do not typically receive such materials in the ordinary course of care (unlike bills or other insurance EOBs), nor do they know where to acquire such materials. That puts another hurdle in the way of a claimant with more time and expense involved to figure out what is sought and where to obtain, and to get copies and incur more mailing expense.

44.    At no time in the process does JNLIC seek to obtain information directly from a provider or other person; rather, JNLIC mails letters requiring the policyholder to provide such material and closes a file if not done, even though JNLIC is aware there is a diagnosed cancer requiring treatment.

**PLAINTIFF'S ORIGINAL PETITION**                                      Page 11

45.    In particular, JNLIC does not use the HIPAA Authorization it procures in the beginning to contact billing or admin departments (or others who would be familiar with such materials and can provide) and request the information sought.

46.    JNLIC's failure to utilize its HIPAA Authorization to obtain any information after being provided with one and then bills and/or EOBs showing treatment that identifies the provider is a breach of its duties to conduct a reasonable investigation and assist a policyholder to obtain benefits.

47.    Even if a policyholder is able to figure out on their own where to acquire the unfamiliar materials sought and get them submitted, JNLIC then exploits a policyholder's lack of knowledge about billing codes and medical terminology to a grossly unfair degree by selectively picking out information upon which to deny a claim, to the exclusion of other information that supports a claim, and without ever providing a reasonably understandable written explanation. All JNLIC sends is its own "explanation of benefits" with brief references and incorrect or misleading numbers and figures to obscure the basis for its decisions (both on payments, underpayments, and denials). That is done to discourage persons from questioning a determination or further seeking benefits.

48.    JNLIC also does not inform claimants of other benefits they may be entitled to under the Policy unless a specific inquiry is made, even when the company already has information to determine benefits are due.

49.    For example, JNLIC has a policyholder's address on file and can tell from a claim form—as well as bills or insurance EOBs after that—whether or not

the policyholder's provider is more than 50 miles away. Yet, JNLIC does not inform a policyholder they may be entitled to a transportation benefit (with the forms in the beginning not giving a claimant an option to claim or notice either).

50.    The iterative sending of letters and requiring response by mail with requests for ever more material is unnecessary, increases the costs and time spent by policyholders, and is by such means also designed to extend the processing period and delay payment, while also knowingly resulting in valid claimants giving up in the process (or, worse, passing away from cancer in the meantime), so as to allow JNLIC to close a file without having to pay cash due under the Policy.

51.    All this JNLIC does while fully aware the persons seeking benefits are either battling cancer themselves or dealing with it in a close family member.

**D.  DEBRA VEALE IS A LONG-TIME HOLDER OF A CANCER POLICY**

52.    In 1989, Debra Veale was an elementary school teacher in the Anna Independent School District who was presented with the option to purchase a cancer treatment policy from Great American Reserve Insurance Company, as part of her employer's slate of benefit offerings.

53.    She was persuaded to buy family coverage (and add "dread disease" and "intensive care" riders, which are not limited to cancer) and accordingly, on November 1, 1989, issued a guaranteed renewable Policy (# A1096860) for a premium of $24.99 per month. *See* **Exhibit 1**.

54.    Mrs. Veale dutifully paid the premium ever since, for decades.

### E. MRS. VEALE'S HUSBAND GETS STOMACH CANCER IN 1993.

55.     In December 1993, Mrs. Veale's husband—Hugh Veale, who was also a teacher and football/track coach—was diagnosed with stomach cancer.

56.     Mrs. Veale did not recall at that time that she had a cancer policy with dependent benefits, so did not make a claim on the Policy for that cancer.

57.     Eventually she later realized the Policy covered her husband and submitted a claim for benefits. To her recollection, Conseco (as JNLIC was then known) denied initial diagnosis benefits on the basis it was not timely sought, but did pay certain treatment benefits that Hugh Veale later underwent for stomach cancer (which recurred at least once in the years thereafter).

58.     The stomach cancer was eventually beaten and Hugh Veale became cancer free in that area.

### F. DECADES LATER, MRS. VEALE'S HUSBAND GETS PANCREATIC CANCER.

59.     Nearly thirty years later, on or about February 3, 2022, however, Hugh Veale was unfortunately diagnosed with pancreatic cancer—which was unrelated to the prior stomach cancer—after a biopsy at UT Southwestern in Dallas, Texas.

60.     Over the course of a year, he would undergo numerous in- and out-patient treatments for pancreatic cancer which included chemotherapy, hospitalization, surgery, anesthesia, blood costs, attending physicians, prescription

drugs, and numerous instances of traveling more than 50 miles back and forth from his home in Grayson County (Van Alstyne and later Sherman)[5] to the Dallas area.

61.   Mrs. Veale was there to support her husband through his new battle with cancer, and sought the benefits promised by "THE CANCER FIGHTER" Policy, but has had to battle against JNLIC as well nearly every step of the way.

### (i)  Diagnosis Benefits – Mrs. Veale Gets the Run-Around for Months Until a "Payment" from 1997 Magically Appears.

62.   Mrs. Veale contacted JNLIC by phone within days of the new pancreatic cancer diagnosis to promptly seek all benefits available this time around.

63.   JNLIC acknowledged her notice by a letter dated February 7, 2022, which provided a proof of loss form titled "Claimant's Statement Cancer Insurance Only" that she was directed to complete and further submit a signed physician's statement, HIPPA Authorization, and pathology report.

64.   On February 18, 2022, Mrs. Veale mailed the claim form, which disclosed her husband's stomach cancer in 1993, back to JNLIC for processing. That mailing included a signed physician's statement along with a report showing Hugh Veale had, on February 3, 2022, underwent: (1) an "endoscopic ultrasound-guided fine needle aspiration" ("EUS-FNA") that resulted in a positive diagnosis of pancreatic "adenocarcinoma," (i.e., cancer), which was further determined not to be

---

[5] Mr. and Mrs. Veale resided in Van Alstyne, Texas, when Hugh Veale was diagnosed with pancreatic cancer. They experienced a fire in that home in August 2022, however, that required them to stay in temporary lodging for a few weeks before moving to a new residence in Sherman, Texas. Both locations were more than 50 miles from the cancer treatment facilities in the Dallas area.

a "metastasis" of his prior stomach cancer; and (2) a colonoscopy that removed a tubular adenoma (i.e., a precancerous polyp). *Id.*

65.     Both Mr. and Mrs. Veale signed the authorization forms giving JNLIC all permission it sought to directly obtain health information from any physician, hospital, insurance company, government agency, or otherwise. *Id.*

66.     Starting approximately two weeks after she mailed the forms and continuing on nearly a weekly basis thereafter, Mrs. Veale began calling JNLIC's designated phone number to inquire about the diagnosis benefits in particular, only to be repeatedly told there was no update to give.

67.     About a month later, Mrs. Veale received a check from JNLIC dated as of March 13, 2022, for $75.00. She was expecting significantly more in diagnosis benefits and so kept calling regularly but was again told there was no update.

68.     On or about March 24, 2022—more than a month after the proof of cancer diagnosis was submitted and without written explanation—a representative of JNLIC called to tell Mrs. Veale her claim for diagnosis benefits was denied on the basis it was paid once already in relation to the prior stomach cancer.

69.     Mrs. Veale disputed that, recalling diagnosis benefits were denied in the 1990s on the basis her claim was not timely submitted, and that only some subsequent treatment or doctor bills were paid in relation to that other cancer.

70.     The phone representative acknowledged her dispute and told Mrs. Veale the claim would be resubmitted as a result.

71.    When she called several days later to check on status again, however, Mrs. Veale was contradictorily told she must instead mail in a written appeal.

72.    On April 1, 2022, Mrs. Veale mailed a letter explaining she was denied diagnosis benefits in the past and requesting proof of any prior payment as claimed.

73.    Mrs. Veale again periodically called after mailing that letter and was, as usual, told no update was available, until her call on April 27, 2022, when a representative said proof of the prior payment would be sent to her.

74.    After waiting a week with nothing arriving in the mail, Mrs. Veale called again on May 3, 2022, and was contradictorily told then that JNLIC would not provide proof of payment because it did not keep records that far back.

75.    That was a false or misleading statement which is anticipated to have been made to conceal that JNLIC's records did not support a prior payment of diagnosis benefits as claimed (or, at minimum, revealed an underpayment).

76.    Mrs. Veale called again on May 12, 2022, and the phone representative reported that JNLIC suddenly found a $1,425.00 payment made on August 12, 1997, but still would not commit to provide proof of the payment. She reasonably demanded to see proof as she specifically recalled being denied the benefit, but was told her only recourse was to again mail an appeal to the claims department.

77.    On May 13, 2022, she sent a second letter to JNLIC as directed appealing in writing the denial, explaining once again the course of events as she recalled and further highlighting a payment of $1,425.00 in diagnosis benefits in

August 1997 did not make mathematical sense due to the number of months the Policy would have been in effect for a cumulative benefit.

78.    She did not herself receive further response from JNLIC.

79.    Throughout those several months of seeking diagnosis benefits, Mrs. Veale was consistently routed in the first instance to a foreign call center with representatives who did not speak English in a way she could understand well, and had to request to speak with a US-based representative, spending hours on the phone waiting and in great frustration. She also had to make copies of materials and incur the time, costs, and burden of sending them through the mail each time.

80.    The process was mentally and emotionally draining and distressing, more so given her husband was suffering from cancer at the same time, of which JNLIC was aware given the initial notice and submissions made.

### *(ii)  Denial of Treatment Benefits – JNLIC Employs its "Other Insurance" Ruse to Deceive, Delay, and Deny.*

81.    While Mrs. Veale was laboring to get information from JNLIC concerning the diagnosis benefits, her husband began the fight back against pancreatic cancer by a course of chemotherapy treatments starting in March 2022.

82.    Mrs. Veale sought benefits under the Policy for that as well.

83.    On May 16, 2022, she mailed in a detailed bill from UT Southwestern—including specifically the "Simmons Comprehensive Cancer Center"—for cancer treatments and care from diagnosis to the beginning of May

2022, which encompassed four chemotherapy sessions[6] and related visits. That bill identified each provider (including the doctors by name), each date of service, billing codes, related billing description detail, and the amounts by each line item, which totaled more than $89,000 in costs charged to the account of Hugh Veale.[7]

84.     No further information was necessary for a reasonable insurer to determine cash benefits were due for a Chemotherapy Benefit, as well as Transportation Benefits for mileage to and from the address on file to the providers and treatment facilities in the Dallas area, for each date listed.

85.     Yet, JNLIC knowingly and intentionally failed to "immediately" pay all benefits due as required by its Policy and, in doing so, breached the contract, violated its duties of good faith and fair dealing, failed to make timely decisions or prompt payment, and further engaged in deceptive trade practices that include knowingly and intentionally misleading its long-time policyholder.

86.     That JNLC did first by employing the false and misleading ruse of seeking to recast its Policy as excess or gap insurance that is limited to paying only what costs remained after "other insurance" paid or adjusted the hospital bill.

87.     Indeed, in the first substantive correspondence on the matter, dated June 1, 2022, JNLIC sent a letter in the mail stating it would not consider Mrs.

---

[6] The initial four chemotherapy sessions occurred on or about March 13, March 25, April 15, and April 28, 2022, with other appointments and travel required for related doctor visits, bloodwork and injections in a chemotherapy course of treatment, as well surgical procedures related to the pump.

[7] In addition, the bill showed amounts adjusted and payments by other insurance after the costs and charges were incurred, and the balance then due.

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 19**

Veale's claims for treatment benefits without first receiving "Medicare Explanation of Benefits/other insurance Explanation of Benefits" showing "actual incurred expenses *(amount left after the other insurance paid)* for ... diagnostic lab expense and ... chemotherapy expenses." (emphasis added). *See* **Exhibit 2**.

88.     Nothing in that letter mentioned a Transportation Benefit; JNLIC did not process that benefit or inform Mrs. Veale she may qualify for such benefit.

89.     Mrs. Veale called JNLIC soon after receiving the letter requesting other insurance EOBs and questioned why that was needed. The phone representative had no answer and said it would be referred to the claims handler.

90.     She called again on June 15, 2022, and was told another letter was in the mail. Mrs. Veale recalls the person she got through to at that time being particularly rude, evidently for continuing to call and question the matter.

91.     Two days later, Mrs. Veale received a letter dated as of June 9, 2022, which further cited the inapplicable free or gratuitous exclusion, stating as follows:

> This is in response to your appeal on the above listed claim. Your policy states "No benefits will be paid under this policy unless a legal liability exists for the payment of expenses incurred for the treatment of services rendered." So, if other insurance has paid your providers, there are no expenses incurred for this insurance policy.

*See* **Exhibit 3**. The assertion no benefits were due "*if other insurance has paid your providers*" revealed a pre-determined intent to deny and/or underpay. It further was a knowing and intentionally false representation of the Policy terms and facts, designed to mislead Mrs. Veale into giving up on seeking full benefits.

### *(iii)  Mrs. Veale Engages Counsel to Assist; JNLIC Proceeds to Carry Out its Bad Faith Denial.*

92.    Mrs. Veale thereafter found it necessary to engage an attorney as she was being rebuffed herself on nearly all fronts in seeking benefits under a Policy for which she had been paying monthly premiums for over 32 years.

93.    The initial law firm she engaged, MT2 Law Group, sent a letter to JNLIC on June 22, 2022, requesting payment of a full diagnosis benefit (and those involving treatment as well), noting in particular that JNLIC had been requested to send proof of any prior payment it claimed was made but none was ever provided.

94.    JNLIC did not initially respond to that legal correspondence and instead continued sending letters directly to Mrs. Veale.

95.    Nearly a month later, on July 19, 2022, JNLIC finally acknowledged her legal representation by a fax sent to the law firm demanding that attorney provide written authorization from Mrs. Veale within five days.

96.    In the meantime on that same day, July 19, 2022, JNLIC called Mrs. Veale directly to try and engage her in regard to the disputed matters. That appears to have been an improper effort to circumvent her counsel.

97.    The authorization for the attorney was faxed back that day.

98.    On July 20, 2022, JNLIC provided, for the very first time, a written explanation for its denial of diagnosis benefits—to the attorney—stating:

> This is in response to your correspondence dated June 22, 2022. Our records show that the Initial Occurrence benefit of $750.00 was previously paid for Hugh Veale on August 12, 1997, based on a diagnosis made on December 14, 1993. The Positive Diagnosis Test benefit was also paid at that time. These benefits are payable once per insured.

*See* **Exhibit 4**. JNLIC notably omitted mention of the "cumulative" benefit and still did not provide a copy of any "records" it claimed to have showing payment occurred, despite multiple requests made by that time.

99. That was a further effort by JNLIC to conceal its own records did not show a prior payment of full diagnosis benefits as previously represented.

100. On July 21, 2022, Mrs. Veale sent Medicare summaries and other insurance EOBs as requested (unnecessarily) by JNLIC in relation to the chemotherapy, hospital stays, and other treatments up to September 2022. Those included proof of another chemotherapy session[8] that occurred in the meantime, with related doctor visits, as well as a hospital stay in May 2022.

101. JNLIC then finished off its pre-determined path of denial using the "other insurance" ruse by, on August 12, 2022, further denying chemotherapy benefits because "*... **Medicare paid at 100%**.*" *See* **Exhibit 5** (emphasis added).

102. That was another false, misleading, bad faith, and deceptive act.

103. On that same date, August 12, 2022, JNLIC also began executing its other tactic for delaying and denying benefits by a letter sent to Mrs. Veale seeking further iterative and unnecessary information; specifically, a "copy of form UB-04" and "CMS-1500/bill" listing "diagnosis code(s)" in relation to processing benefits sought for the hospital stay from May 20 to May 25, 2022.

104. JNLIC made no effort to obtain such material from the cancer center it already knew was involved, even though it had a HIPAA Authorization to do so.

---

[8] That additional chemotherapy session occurred on or around May 13, 2022.

105.   Rather, JNLIC did nothing to assist its policyholder of more than three decades—in the midst of dealing with a spouse's cancer—obtain any information, and thereafter was content to simply deny the hospital-related benefits on September 21, 2022, on the basis that no materials were provided by Mrs. Veale.

106.   In the meantime, Mrs. Veale sent another detailed bill she received from UT Southwestern with line items showing more than $198,000 in additional costs charged to the account of Hugh Veale for cancer treatments through July 2022 (with him spending much of the entire month of July in the hospital).[9]

107.   The sole additional matters JNLIC accepted and paid from that bill was for a July 6 to July 10 hospital stay for surgery on his pancreas, anesthesia, some blood costs, and prescription drug maximums (as well as certain daily rates for subsequent readmissions to the hospital—on July 11, 2022, and July 25, 2022— due to complications from the pancreatic surgery, but only under a separate Intensive Care rider that did not depend on cancer treatment).

108.   That brought the total amount JNLIC paid on its Policy as of September 21, 2022, to $7,026.00, in relation to over $280,000.00 in charges.

109.   Incredibly, JNLIC at the same time declined to pay other benefits for even the July 6 surgery (which was known already to be for cancer) on the basis

---

[9] Hugh Veale was admitted to UT Southwestern from May 20-25, 2022, due to chemotherapy-related problems; from July 6-10 for cancer surgery; readmitted soon after that discharge and stayed from July 11-20 due to complications from surgery; and once again readmitted from July 25-29 for further issues related to the surgery, in which he also underwent a surgical endoscopic procedure.

that JNLIC supposedly still needed "pathology" and "operative" reports to determine if any other cancer-related benefits were due. *See* **Exhibit 6**.

110.    JNLIC also avoided paying benefits for the other hospital stays in July 2022—other than intensive care previously noted—on the basis again of supposedly needing "UB-04" and "CMS-1500" forms to determine if benefits were due. *Id.*

111.    Such materials were unnecessary as it was already clear from the billing forms and other information provided that all the matters involving UT Southwestern were for cancer treatment. JNLIC's actions thus were undertaken to be difficult, delay and/or search for select information to avoid payment.

112.    And further, once again, JNLIC failed to itself obtain anything it sought from the hospital, putting all onus on Mrs. Veale to do so in the midst of caring for and supporting her husband through an intense battle with cancer.

113.    Indeed, on October 27, 2022, JNLIC closed its file without obtaining any information itself or making any payments due for the various hospital stays in July 2022 on the basis it did not receive from Mrs. Veale the additional materials it knew that policyholders are not ordinarily given. *See* **Exhibit 7Pe**.

114.    JNLIC also continued failing to process or inform Mrs. Veale of any Transportation benefits (which consisted of mileage but not lodging, since Mrs. Veale stayed in the hospital with her husband while he battled cancer).

### *(iv) JNLIC Changes Course, in Part, Only Due to a Regulatory Inquiry by the Texas Department of Insurance.*

115.    Thereafter, Hugh Veale was able to recover from the surgery complications enough to resume his chemotherapy course of treatment.

116.  Mrs. Veale sought new counsel in the meantime because the attorney from the original firm she engaged was planning to retire from active law practice.

117.  Her current undersigned counsel was engaged and spent substantial time reviewing and analyzing the iterative correspondences and vague explanations by JNLIC (for both the payments made and denials), the insurance Policy, submissions of numerous bills, forms, and EOBs that JNLIC required, the applicable law, and other legal work to prepare a comprehensive notice of violations, as well as prior notice of this potential class action if JNLIC did not change its course of conduct (the "Notice").

118.  The Notice requested that JNLIC pay Mrs. Veale a specific amount of economic losses, mental anguish, and attorney's fees, as well as provide written assurances all the improper conduct in delaying and denying payments would cease both as to Mrs. Veale individually and all others similarly situated.

119.  That Notice was sent to JNLIC on January 18, 2023, along with submissions of additional Medicare summaries that became available showing three more chemotherapy sessions and related treatments/visits.[10]

120.  A copy of the Notice was sent also to the Texas Department of Insurance ("TDI"), which got involved to request a response from JNLIC.

121.  Only then—due apparently to regulatory inquiry—did JNLIC suddenly become willing to provide more information and explanations (only to TDI though,

---

[10] Those sessions occurred on or around June 3, Sept. 14, and Sept. 27, 2022.

with that agency's intervention needed to get JNLIC to provide the same information to Mrs. Veale's counsel), and to make partial payments long past due.

122.   In the process, JNLIC was forced to finally reveal that it did not have proof of a proper payment of initial diagnosis or cumulative benefits.

123.   Further, JNLIC continued to deny portions of cash payments well past due for nearly all other categories of benefits available under the Policy, including chemotherapy, hospital stays, surgical procedures, anesthesia, attending physician visits, prescription drugs, blood costs, and transportation benefits (not to mention failing to pay the full amount of statutory interest due), each in an amount which exceeds the jurisdictional prerequisites of this Court.

124.   That specifically included (but is not limited to) failure to pay for all costs charged for substances, injections, and other services in the chemotherapy course of treatments, which JNLIC did without any explanation.

125.   In addition, after apparently obtaining "UB-04" and/or "CMS-1500" forms, JNLIC proceeded to further deny payment of certain hospital-related benefits on the basis that a single "diagnosis code" on one form was not specific to cancer, which willfully ignored other codes and the full context of all information which already confirmed all services were "as a result of" cancer treatment.

126.   On March 20, 2023, after further Medicare summaries and insurance EOBs became available, proof of three more chemotherapy sessions[11] and related treatment/visits were submitted to JNLIC for payment.

---

[11] Those sessions occurred on or around Oct. 25, Nov. 17, and Dec. 2, 2022.

127.    As of the date of this filing, over a month later, however, JNLIC has not paid on the recent submission even for the same portion of expenses paid in response to TDI's inquiry, and thereby continued and/or resumed breaching its duties and obligations to act in good faith, deal fairly, and make prompt payment.

128.    JNLIC thus continues to act in bad faith, breach the contract, engage in deceptive trade practices, and commit other violations of law, and has given no assurances of ceasing its improper conduct as to future claims of Mrs. Veale or others similarly situated, absent relief being granted by this Court.

129.    All conditions precedent have been performed or occurred.

## CLASS ALLEGATIONS

130.    All preceding paragraphs are restated in full.

131.    Plaintiff Debra Veale seeks to recover on her own behalf and further brings this action as a representative on behalf of the following proposed classes:

> The "Nationwide Class": All holders of a cancer treatment policy with or administered by Jefferson National Life Insurance Company within the past three (3) years who have in that time been denied or paid less than the full costs they submitted for cancer treatment on the basis that all or part of the costs were paid or adjusted by other insurance.

> The "Texas Subclass": All holders of a cancer treatment policy with or administered by Jefferson National Life Insurance Company within the past three (3) years who resided in the State of Texas and have in that time been denied or paid less than the full costs they submitted for cancer treatment on the basis that all or part of the costs were paid or adjusted by other insurance.

> The "Nationwide Chemotherapy Subclass": All holders of a cancer treatment policy with or administered by Jefferson National Life Insurance Company within the past three (3)

years who have in that time been denied or paid less than the full costs submitted for all substances injected, items used, or services provided during a chemotherapy course of treatment.

The "Texas Chemotherapy Subclass": All holders of a cancer treatment policy with or administered by Jefferson National Life Insurance Company within the past three (3) years who resided in the State of Texas and have in that time been denied or paid less than the full costs submitted for all substances injected, items used, or services provided during a chemotherapy course of treatment.

The "Nationwide Failure to Investigate Subclass": All holders of a cancer treatment policy with or administered by Jefferson National Life Insurance Company within the past three (3) years who have in that time been denied payment of any benefits for cancer treatment on the basis that a policyholder failed to submit Form UB-04, CMS-1500, or medical reports, after having already provided a HIPAA Authorization.

The "Texas Failure to Investigate Subclass": All holders of a cancer treatment policy with or administered by Jefferson National Life Insurance Company within the past three (3) years who resided in the State of Texas and have in that time been denied payment of any benefits for cancer treatment on the basis that a policyholder failed to submit Form UB-04, CMS-1500, or medical reports, after having already provided a HIPAA Authorization.

132.    Excluded from each of the above classes are officers, directors, or employees of JNLIC, the company, its affiliates, or its legal representatives, heirs, successors, and assigns, and any Judge to whom this case is assigned and his or her immediate family.

133.    The foregoing definitions may be expanded or narrowed based on additional information obtained through investigation, discovery in this proceeding, or as may otherwise occur in the course of this action.

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 28**

134.   The Nationwide Class, Texas Subclass, Nationwide Chemotherapy Subclass, Texas Chemotherapy Subclass, Nationwide Failure to Investigate Subclass, and Texas Failure to Investigate Subclass are hereinafter individually and collectively referred to as the "Class."

135.   The members of the Class are geographically dispersed and so numerous that individual joinder is impracticable. Although the precise number of Class members is unknown to Plaintiff at this time, the exact number of Class members is known to JNLIC. Specifically, JNLIC (and/or its affiliates or contractors on its behalf) maintain databases and other records that contain the following: (i) the name of each Class member; (ii) the last known address and other contact information of each Class member; and (iii) each Class member's claim file. Thus, all Class members may be identified through discovery and notified of this class action by first class mail, electronic mail, and/or published notice.

136.   This action accordingly has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is readily ascertainable.

137.   Common questions of law and fact exist as to all members of the Class and predominate over individual questions, as proof of a common set of facts and/or law will establish the right of each member of the Class to recover damages. These common questions include, but are not limited to, the following:

> a.   Whether the terms of JNLIC's insurance contract limit or exclude payment of costs for a cancer treatment based on any other insurance held by a patient or policyholder being applied to pay or adjust a bill;

b.    Whether the terms of JNLIC's insurance contract exclude payment of the costs of any substances injected, items used, or services provided at any time during a chemotherapy course of treatment;

c.    Whether JNLIC defrauds, deceives, misrepresents, or misleads policyholders by stating the policy is limited to (or without disclosing it is treated as limited to) paying benefits only to the extent a cost for cancer treatment is not otherwise paid or adjusted by other insurance;

d.    Whether JNLIC defrauds, deceives, misrepresents, or misleads policyholders by stating the policy excludes (or without disclosing it is treated as excluding) payment of the costs of any substances injected, items used, or services provided at any time during a chemotherapy course of treatment;

e.    Whether failure of JNLIC to request materials directly from a medical provider that are not ordinarily given to a patient—specifically including but not limited to Form UB-04, CMS-1500, and medical reports—after having received a HIPAA Authorization, is a breach of JNLIC's duty to conduct a reasonable investigation and/or assist a policyholder to obtain benefits;

f.    Whether JNLIC's uniform conduct as applied through its policies, procedures, and practices as to each Class member constitutes a breach of contract;

g.    Whether JNLIC's uniform conduct as applied through its policies, procedures, and practices as to each Class member constitutes a breach of the duty of good faith and fair dealing;

h.    Whether JNLIC's uniform conduct as applied through its policies, procedures, and practices as to each Class member constitutes fraud or negligent (or grossly negligent) misrepresentation;

i.    Whether JNLIC's uniform conduct as applied through its policies, procedures, and practices as to each Class member constitutes an untrue, deceptive, and/or misleading assertion, representation, or statement

prohibited by Chapter 541 of the Tex. Ins. Code (and/or similar law in other states);

j.    Whether JNLIC's uniform conduct as applied through its policies, procedures, and practices as to each Class member constitutes a deceptive trade practice that is prohibited by Chapter 17 of the Texas Bus. & Com. Code (and/or similar law in other states);

k.    Whether JNLIC's uniform conduct as applied through its policies, procedures, and practices as to each Class member constitutes a breach of Chapter 542 of the Texas Ins. Code (and/or similar law in other states);

l.    whether Plaintiff and the Class have sustained actual monetary loss and the proper measures of that loss;

m.    whether Plaintiff and the Class are entitled to increased statutory interest awards;

n.    whether Plaintiff and the Class are entitled to treble, punitive, and/or exemplary damages;

o.    whether Plaintiff and the Class are entitled to injunctive relief;

p.    whether Plaintiff and the Class are entitled to an award of attorney's fees and costs.

q.    whether Plaintiff and the Class are entitled to other relief.

138.    The claims of Plaintiff are typical of and have the same essential characteristics as the claims of all other Class members in that JNLIC uses the same practices, policies, and procedures as to each member.

139.    Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel that is competent and has prior experience with class action litigation. Furthermore, Plaintiff has no interests that are antagonistic to the members of the Class and has suffered the same harm.

<u>PLAINTIFF'S ORIGINAL PETITION</u>                                    Page 31

140.    Plaintiff's counsel has spent substantial time investigating the issues, this class action, and representing Plaintiff in regard to these same claims against JNLIC, and intends to vigorously prosecute this action on behalf of and for the benefit of all members of the Class, with adequate resources to do so.

141.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. The prosecution of separate actions by each individual member of the Class would impose heavy burdens upon the courts while creating a risk of inconsistent or varying adjudications of the questions of law and fact that are common to the Class, and risk impairing Class members' rights or the disposition of their interests through actions to which they were not parties. Individualized litigation would also increase the delay and expense to all parties and the court system. Class members who purchase cancer treatment policies also do not have adequate individual resources to afford their own legal counsel and the expenses of litigation. By contrast, the class action device provides the benefits of adjudicating the common issues in a single proceeding, creating economies of scale, with comprehensive supervision by a single court. Plaintiff is not aware of any unusual management difficulties under the circumstances, while an important public interest will be served by addressing the matter as a class action.

142.    In the alternative, the Class may also be certified because:

    a.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for JNLIC;

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.    Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

***Count I:*** ***Breach of Contract***

143.    All preceding paragraphs are restated in full.

144.    The applicable cancer insurance policy is a valid enforceable contract.

145.    Plaintiff[12] is a proper party to bring suit for breach of that contract.

146.    Plaintiff performed, tendered performance of, or was excused from performing all contractual obligations.

147.    JNLIC breached its obligations in the ways described herein to cause injury by failing to immediately pay the full amount of cash benefits due.

***Count II:*** ***Breach of the Duty of Good Faith and Fair Dealing***

148.    All preceding paragraphs are restated in full.

149.    The applicable cancer insurance policy is a valid enforceable contract which gives rise to a duty of good faith and fair dealing.

---

[12] Reference to Plaintiff in this Causes of Action section is meant to also include and be applicable to each of the Class members.

150.   JNLIC breached its duties by providing false or misleading information, by deceptive omissions, and/or denying, delaying, or underpaying cash benefits after it was reasonably clear that cancer diagnosis and treatment occurred.

151.   JNLIC's breach proximately caused Plaintiff to suffer injury by the delay in and/or failure to receive cash benefits when due, loss of time, postage and other expenses, and mental anguish.

152.   JNLIC's conduct was fraudulent, malicious, intentional, or grossly negligent, subjecting it to punitive or exemplary damages.

### *Count III:*   *Negligent Misrepresentation*

153.   All preceding paragraphs are restated in full.

154.   JNLIC made representations to Plaintiff in the course of its business or in a matter in which JNLIC had a pecuniary interest.

155.   JNLIC supplied false information for the guidance of others.

156.   JNLIC did not use reasonable care in obtaining or communicating the information and Plaintiff justifiably relied on the representations.

157.   JNLIC's negligent misrepresentations caused Plaintiff to suffer injury by the delay in and/or failure to receive cash benefits when due, loss of time, postage and other expenses, and mental anguish.

### *Count IV:*   *Tex. Ins. Code ch. 541*

158.   All preceding paragraphs are restated in full.

159.   JNLIC (itself and/or through its predecessors) is a Texas-chartered insurance company that issued policies from its home office in Dallas, Texas, and

subsequently breached duties owed to all its policyholders under Chapter 541 of the Texas Insurance Code (and/or similar statutes and duties in other states) by doing one or more of the following:

a.   Making, issuing, or circulating an illustration, circular, or statement (or causing any of the same to occur) that misrepresented the benefits or advantages promised by the cancer treatment policies at issue;

b.   Making, publishing, disseminating, circulating, or placing before the public an advertisement, announcement, or statement (or directly or indirectly causing any of the same to occur) containing an untrue, deceptive, or misleading assertion, representation, or statement regarding the business of insurance;

c.   misrepresenting a material fact or policy provision relating to the coverage at issue;

d.   failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which liability was reasonably clear;

e.   failing to promptly provide a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for denial of a claim;

f.   refusing, failing, or unreasonably delaying payment on the basis that other coverage may be available or that others are responsible for payment;

g.   refusing to pay a claim without conducting a reasonable investigation with respect to the claim;

h.   misrepresenting the insurance policy by making an untrue statement of material fact, or failing to state material facts to make other statements not misleading, or making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact, or making a material misstatement of law; or

     i.    representing an agreement "confers or involves rights, remedies, or obligations which it does not have or involve" in violation of Tex. Bus. & Comm. Code § 17.46(b)(12) that was relied on to Plaintiff's detriment.

160.    JNLIC's acts were done knowingly or intentionally.

161.    JNLIC's acts or practices were a producing cause of Plaintiff's damages and other losses.

## Count V:   Tex. Bus. & Comm. Code ch. 17

162.    All preceding paragraphs are restated in full.

163.    Plaintiff is a "consumer" with rights under the Texas Deceptive Trade Practices Act (and/or similar deceptive trade practices statutes in other states).

164.    JNLIC committed one or more of the following wrongful acts:

    a.    representing an agreement "confers or involves rights, remedies, or obligations which it does not have or involve";

    b.    an unconscionable course of conduct; or

    c.    use or employment of an act or practice in violation of Tex. Ins. Code ch. 541.

165.    JNLIC's acts were done knowingly and intentionally.

166.    JNLIC's acts or practices were a producing cause of Plaintiff's damages and other losses.

## Count VI:   Tex. Ins. Code ch. 542

167.    All preceding paragraphs are restated in full.

168.    Plaintiff made a claim under a cancer treatment policy.

169.    JNLIC was liable to pay the claim.

170. JNLIC failed to acknowledge, investigate, accept or reject (or provide timely written explanation), or pay the claim within the deadlines set by Tex. Ins. Code ch. 542 (and/or similar statutes, rules, and law in other states).

**_Count VII:_**  **_Injunctive Relief_**

171. All preceding paragraphs are restated in full.

172. Plaintiff Debra Veale seeks, on her own behalf and on behalf of all Class members, an injunction to prohibit JNLIC from continuing to engage in the unlawful practices complained of herein. Unless restrained by this Court, JNLIC will continue to violate the cancer treatment policies and deal with current and future policyholders in ways that constitute a violation of its duties under statute and common law, and that are deceptive trade practices, causing injury to all.

173. Plaintiff has no other adequate remedy at law to ensure future compliance by JNLIC with the duties described herein.

174. Therefore Plaintiff requests permanent injunctive relief.

## ATTORNEYS' FEES

175. All preceding paragraphs are restated in full.

176. Plaintiff Debra Veale was and is required to engage attorneys to seek a full recovery, and is entitled to an award of all fees, costs, and expenses for breach of contract, *see* TEX. CIV. PRAC. & REM. CODE § 38.001, under the Insurance Code, *see* TEX. INS. CODE §§ 541.152(a)(1), 542.060(a), the Deceptive Trade Practices Act, *see* TEX. BUS. & COMM. CODE § 17.50(d), and counsel in this case is further entitled to an award of fees as a matter of equity and common benefit to the Class.

## JURY TRIAL

177.   Plaintiff requests a trial by jury of all issues so triable.

## PRAYER

WHEREFORE, Plaintiff Debra Veale requests this Court:

- Certify this action with each Class proposed, appoint Debra Veale as Class Representative, and appoint Wright Commercial Litigation as Class Counsel;

- Award all actual, economic, general, special, and other damages;

- Award treble, punitive, and/or exemplary damages;

- Award permanent injunctive relief against JNLIC;

- Award attorneys' fees, expenses, and court costs, as well as conditional awards in the event of any post-verdict proceedings and/or appeals;

- Award statutory interest under Tex. Ins. Code § 542.060(a) and/or similar laws and rules in other states, as well as pre- and post-judgment interest as otherwise provided by law;

  Award all other relief, both special and general, at law or in equity (including expert expenses and litigation costs pursuant to Tex. Ins. Code § 541.152(a)(3) and Tex. Bus. & Comm. Code § 17.50(b)(4)), to which Mrs. Veale, the Class members, and/or counsel may otherwise be entitled.

Dated: April 24, 2023

Respectfully submitted,

**WRIGHT COMMERCIAL LITIGATION**

By: */s/ Jason E. Wright*

Jason E. Wright (TX Bar No. 24063896)
8751 Collin McKinney Pkwy, Ste 1102 #1088
McKinney, TX 75070
Tel: (469) 270-7819
Fax: (469) 270-7822
Email: jason@jwrightlaw.com

***ATTORNEY FOR PLAINTIFF***

# EXHIBIT 1



# GREAT AMERICAN RESERVE

**INSURANCE COMPANY**

Home Office: 2020 Live Oak Street, Dallas, Texas 75201
A Stock Company

**About this Policy**
This policy is a contract providing indemnity benefits for losses incurred as a result of hospital confinement and other specified expenses for the treatment of cancer. As used herein, "you" and "your" mean the Named Insured; "we", "us", and "our" mean Great American Reserve Insurance Company. We have issued the policy in consideration of your application and payment of the first premium.

**Our Promise**
We promise to pay the benefits described in this policy if any Insured Person: (1) incurs expenses, requires treatment or otherwise suffers a covered loss as a result of cancer; (2) is first diagnosed as having cancer on or after the Effective Date of the policy; and (3) incurs the expense or begins the treatment while the policy is in force. We will pay all benefits subject to the terms and conditions contained on this and other policy pages.

**10 Day Right to Examine Policy**
THIS IS A LIMITED POLICY. IT IS A LEGAL CONTRACT BETWEEN YOU AND US. PLEASE READ THIS POLICY CAREFULLY. If you are not satisfied with this policy for any reason, you may return it to us within 10 days after you receive it and obtain a refund of all premiums paid. You may return it by: (1) mailing it to us at the above address; or (2) returning it to our agent who sold it to you. We will promptly refund all premiums paid and the policy will be deemed void from its Effective Date.

J. R. Wood Jr.
Secretary

Ben O Denman
President

(Countersignature of Licensed Agent - if Required)

CANCER TREATMENT INSURANCE POLICY · GUARANTEED RENEWABLE · RENEWAL
PREMIUMS SUBJECT TO CHANGE AT OUR OPTION · NONPARTICIPATING

## TABLE OF CONTENTS

Page

Policy Information ...................................................................... 3

Dependent's Coverage          Part 1 ............................................. 5

Benefit Provisions            Part 2 ............................................. 6

Limitations and Exclusions    Part 3 ............................................. 9

Premium, Renewability and
Termination Provisions        Part 4 ............................................. 10

Claim Provisions              Part 5 ............................................. 11

Other Policy Provisions       Part 6 ............................................. 12

Surgical Schedule             Part 7 ............................................. 13

Where To Find It ................................................. Inside Back Cover

22-9001(09-86)                        Page 2



Policy Information

ANNUAL PREMIUM

CANCER TREATMENT INSURANCE POLICY                                    $191.85

WAITING PERIOD: 30 DAYS
SURGICAL BENEFIT FACTOR: 2.0

ADDITIONAL BENEFIT RIDERS

INTENSIVE CARE RIDER                                                $72.08
DREAD DISEASE RIDER                                                 $36.00

PREMIUMS*

| MONTHLY | QUARTERLY | SEMI-ANNUAL | ANNUAL |
|---------|-----------|-------------|--------|
| $24.99  | $77.97    | $154.44     | $299.88 |

* INCLUDES PREMIUMS FOR ADDITIONAL BENEFIT RIDERS (IF ANY)

AGE AT ISSUE - 33                          POLICY NUMBER    A1096860

POLICY EFFECTIVE DATE                       TOTAL INITIAL PREMIUM    $24.99
NOVEMBER 01, 1989

DEBRA VEALE                                 FAMILY COVERAGE
P O BOX 1041
VAN ALSTYNE, TX   78095

22-9001(09-88)                              PAGE 3

POLICY NUMBER:  A1095860

POLICY  SCHEDULE.

CANCER TREATMENT INSURANCE POLICY BENEFITS:

INITIAL DIAGNOSIS BENEFIT
    FOR YOU ............................................. . $1500
    FOR YOUR INSURED DEPENDENTS ........................ .. $ 750
CUMULATIVE FIRST OCCURRENCE BENEFIT
    FOR YOU .. ................................ ............ . $30 PER MONTH
    FOR YOUR INSURED DEPENDENTS ....................... . $15 PER MONTH
HOSPITAL CONFINEMENT BENEFIT
    FIRST 70 DAYS............................... . . $200 PER DAY
    71ST DAY AND THEREAFTER ................................ . . $400 PER DAY
POSITIVE DIAGNOSTIC TEST BENEFIT LIFETIME MAXIMUM ... .. ............... $300
SURGICAL BENEFIT................................. SEE SURGICAL SCHEDULE.
PRESCRIPTION DRUGS AND MEDICINES BENEFIT MAXIMUM ....... . $50 PER DAY
RADIATION, CHEMOTHERAPY AND IMMUNOTHERAPY BENEFIT
    LIFETIME MAXIMUM ...................................... ......... NO MAXIMUM
    ATTENDING PHYSICIAN BENEFIT MAXIMUM .................. . $30 PER DAY
    NURSING SERVICES BENEFIT MAXIMUM ................... $100 PER DAY
    ANESTHESIA BENEFIT MAXIMUM ...................25% OF SURGICAL BENEFIT
BLOOD, PLASMA, AND PLATELETS BENEFIT
    LIFETIME MAXIMUM .............................. ...... NO MAXIMUM
PROSTHESIS BENEFIT LIFETIME MAXIMUM ............................ $1000
TRANSPORTATION BENEFIT
    COMMON CARRIER BENEFIT MAXIMUM ............... $1000 PER ROUND TRIP
    PRIVATE PASSENGER BENEFIT MAXIMUM ...........THE LESSER OF $350 PER
                                            ROUND TRIP OR $.40 PER MILE
AMBULANCE BENEFIT
    AIR AMBULANCE BENEFIT MAXIMUM................. $1000 PER CONFINEMENT
    GROUND AMBULANCE BENEFIT MAXIMUM ..............$.350 PER CONFINEMENT
FAMILY MEMBER LODGING BENEFIT MAXIMUM ......................$50 PER DAY UP
                                            TO $2500 PER CONFINEMENT
EXTENDED CARE FACILITY BENEFIT MAXIMUM.................... $50 PER DAY
HOSPICE CARE BENEFIT................................... $75 PER DAY

OPTIONAL RIDER BENEFITS.
    DREAD DISEASE..................................... SAME AS CANCER POLICY
    INTENSIVE CARE BENEFIT.......................... $300 PER DAY

## PART 1. DEPENDENT'S COVERAGE

### ELIGIBILITY

This policy provides insurance for you and your eligible dependents (if any) named in your original application unless specifically excluded by endorsement. Eligible dependents include your:

* spouse; and

* unmarried children less than 21 years of age.

"Children" means your natural children, step-children, adopted children, children pending adoption if living with you and any other children for whom you are a legal guardian.

### ADDING DEPENDENTS

Except for children born to you or a covered dependent after the Effective Date of this policy, any eligible dependent not insured on the Effective Date may be added upon application by you, payment of any additional premium and approval by us. Evidence of insurability as we may require must be furnished to us before coverage will begin. Such evidence will be provided at your expense. Dependents so added will be covered only for cancer first diagnosed 30 or more days after they are approved for coverage by us and the required premium is paid.

### NEWBORN CHILDREN

Children born to you or a covered dependent after the Effective Date of this policy will be insured immediately from the moment of birth for a period of 31 days. Coverage shall be that provided any other insured dependent under the policy. No evidence of insurability will be required.

To continue coverage for a newborn child, you must notify us of the birth within 31 days after the date of birth. We will then advise you of any premium due for such coverage. You must pay us the premium due within 15 days after notification by us of the amount due. However, if other dependents are provided coverage under this policy, you need not notify us of the birth in order to continue coverage of the newborn and no additional premium will be due.

If a claim becomes payable for a newborn child before the applicable premium is paid, we may

deduct the premium due for the child's coverage from the benefits payable.

### TERMINATION OF DEPENDENT'S COVERAGE

If your coverage terminates as a result of your death, your spouse, if then insured, will become the Named Insured under the policy. Otherwise, coverage on any dependent will terminate on the sooner of:

* the date your coverage terminates;

* 31 days after any premium due date if the premium is unpaid;

* with respect to your spouse, the date of divorce, annulment or marriage or legal separation;

* with respect to newborn children, 31 days after the date of birth, unless we are notified of the birth and any applicable premium is paid, as provided in the "Newborn Children" provision; or

* with respect to other dependent children, the date they attain age 21 or marry, if sooner, subject to the "Continuation of Coverage For Certain Dependents" provision.

However, if we accept a premium applicable wholly or in part for a period past the date coverage would otherwise terminate according to the above, coverage will continue during the period for which the premium was accepted.

Termination of coverage shall not affect any claim or loss commencing prior thereto.

### CONTINUATION OF COVERAGE FOR CERTAIN DEPENDENTS

Despite any of the above, coverage for any unmarried, dependent child may be continued past age 21 if:

* the child is incapable of self-support due to a physical or mental handicap;

* such incapacity started prior to age 21 while insured under this policy;

* a request for continuation and satisfactory proof of the child's incapacity is received by us

  

within 31 days after coverage would otherwise terminate; and

* any required premium is paid.

The premium shall be that which would have been charged on the date coverage would have otherwise terminated.

We have the right once each year to require proof of the child's continuing incapacity. Coverage continued under this provision will terminate on the sooner of:

* the date the child is no longer incapacitated;

* the Premium Due Date following our request for proof of continued incapacity if such proof is not furnished; or

* the date your coverage terminates.

### CONVERSION

Any dependent whose coverage under this policy terminates for any reason other than nonpayment of premium shall have the right to apply for and receive a policy providing similar benefits. No evidence of insurability will be required if the application and payment of the first premium for the new policy are received by us within 31 days after termination of coverage under this policy.

The new policy will take effect on the day following termination of coverage under this policy. The new policy will not cover any loss for which benefits are payable under this policy. Any exclusion periods, waiting periods or periods during which we can contest coverage will be measured from the effective date of this policy.

The premium will be based on the age of the dependent and our rates in effect on the date the new policy is issued.

### PART 2. BENEFIT PROVISIONS

#### DATE OF DIAGNOSIS

If, after the waiting period and while this policy is in force, you or an insured dependent are first diagnosed as having cancer, we will pay benefits as provided below. If the diagnosis is made while hospital confined, we will pay benefits retroactive to the first day of confinement. If hospital

confinement is based on a provisional diagnosis, we will pay benefits retroactive to the date of the provisional diagnosis when and if a positive diagnosis is made. In neither case will retroactive benefits be paid for any period:

* in excess of 30 days; or

* prior to the end of the waiting period.

If you or an insured dependent are first diagnosed as having cancer during the waiting period, benefits will not be payable until two years of continuous coverage after the date of diagnosis. Benefits will be payable for any loss commencing or services rendered thereafter as provided below if the coverage remains in force.

Payment of benefits is subject to all limitations, exclusions, conditions and provisions of this policy.

#### DEFINITIONS

"Date of Diagnosis" means the date the tissue specimen(s), culture(s) and the titer(s) is(are) taken upon which the diagnosis of cancer is based.

"Waiting Period" means a period of time immediately following the date you or an insured dependent is first covered under this policy before becoming eligible for full benefits. No benefits will be paid for cancer first diagnosed during the waiting period except for losses incurred or treatment received at least two years after the date of diagnosis. The waiting period is shown on Page 3.

"Cancer" means a disease, including Hodgkin's Disease and leukemia, which is manifested by the presence of a malignancy characterized by the abnormal and uncontrolled growth and spread of malignant cells and invasion of normal tissue. Cancer is further defined to include cancer confined to the site of origin without having invaded neighboring tissue. Premalignant conditions or conditions with malignant potential are not deemed to be cancer under this policy. Cancer must be positively diagnosed by a physician upon the microscopic examination of fixed tissue or preparations from the hemic system (either during life or post-mortem). The diagnosis must be based solely on the criteria of malignancy as accepted by the American Board of Pathology or the American Osteopathic Board of Pathology after a study of histocytologic architecture or pattern of



the suspect tumor, tissue or specimen.   If a positive diagnosis cannot be made, clinical diagnosis of cancer will be deemed to be a positive diagnosis provided:

• the medical evidence substantially documents the diagnosis of cancer; and

• the insured person receives definitive treatment for cancer.

"Physician" means a licensed practitioner of the healing arts acting within the scope of such license. "Physician" does not include you, your spouse, parents, children, siblings or corresponding in-laws.

"Hospital" means an institution licensed as such and operating within the scope of such license. "Hospital" does not include an institution or that part of an institution operating primarily as a:

• convalescent, rest or nursing home;

• home for the aged, drug addicts or alcoholics;

• facility primarily affording custodial, educational or rehabilitative care or services.

The term "hospital" includes an Ambulatory (out-patient) Surgical Center.

"Hospital Confinement or Confined in a Hospital" means you or an insured dependent is a registered bed-patient overnight in a hospital upon the recommendation of a physician because of:

• surgery;

• emergency care; or

• tests ordered by a physician as a planned preliminary to inpatient admission to a hospital within 4 days.

For the purpose of determining the benefit payable, two days of partial confinement will be considered one full day of confinement.

"Partial Confinement" means continuous treatment for at least 6 hours but not more than 12 hours in any 24 hour period.

"Extended Care Facility" means a nursing facility licensed and operating as such under the laws of the jurisdiction in which it is located which provides continuous 24 hours a day nursing service under the supervision of a graduate Registered Nurse (R.N.).

"Hospice" means an institution or part of an institution which:

• is licensed as such;

• is operated according to law; and

• provides nursing service and Hospice Care for terminally ill patients under the supervision of Registered Nurses at the direction of a physician.

## BENEFITS PAYABLE

Benefits payable for cancer first diagnosed while this policy is in force are:

A.  Initial Diagnosis Benefit — We will pay the lump sum benefit shown in the Policy Schedule if you or an insured dependent are first diagnosed as having cancer (other than skin cancer) after the waiting period.  This benefit will be payable only once with respect to each person insured.

B.  Cumulative First Occurrence Benefit — We will pay a lump sum benefit equal to the amount shown in the Policy Schedule for each full month coverage has been in force after the waiting period if you or an insured dependent are first diagnosed as having cancer (other than skin cancer) after the waiting period.  This benefit will accumulate from the end of the waiting period until the sooner of:

• the date of diagnosis; or

• the date you or the insured dependent attains age 65.

If cancer is first diagnosed after attainment of age 65, the benefit accruing at age 65 will be paid.  This benefit will be payable only once with respect to each person insured.

C. Hospital Confinement Benefit — We will pay the benefit shown in the Policy Schedule for each day of any continuous hospital confinement medically necessary for the treatment of cancer.

D. Positive Diagnostic Test Benefit — If laboratory tests, including x-rays, result in a positive diagnosis of cancer (other than skin cancer) we will pay the actual costs incurred for such tests or x-rays, subject to the lifetime maximum shown in the Policy Schedule. The diagnosis must be made within 90 days of such tests or x-rays.

E. Surgical Benefit — When a surgical operation is performed for the treatment of and following a diagnosis of cancer, we will pay the fee for such operation, including post operative attendance, subject to the maximum stated in the Surgical Schedule. If two or more surgical procedures are performed during the course of a single operation, we will pay the benefit for the more costly procedure performed.

F. Prescription Drugs and Medicines Benefit — Subject to the maximum shown in the Policy Schedule, we will pay the actual charges for prescription drugs and medicines administered to you or an insured dependent for the treatment of cancer while confined in a hospital. Such drugs and medicines must be approved by the United States Food and Drug Administration (FDA).

G. Radiation, Chemotherapy and Immunotherapy Benefit — Subject to the lifetime maximum shown in the Policy Schedule, we will pay the actual costs incurred if you or an insured dependent receive for the treatment of cancer:

- teleradiotherapy using either natural or artificially propagated radiation;

- interstitial or intracavity application of radium or radioisotopes in sealed or non-sealed sources; or

- cancericidal (cytotoxic) chemical substances to include the administration thereof.

Such treatment must be a procedure approved by the FDA.

H. Attending Physician Benefit — We will pay the actual costs incurred, subject to the maximum shown in the Policy Schedule, each day you or an insured dependent, while hospital confined, require the services of and are visited by a physician other than the surgeon who performed surgery. The term visit means an actual personal call by the physician.

I. Nursing Services Benefit — We will pay the actual costs incurred, subject to the maximum shown in the Policy Schedule, each day you or an insured dependent, while hospital confined, require full-time, 24-hour private care and attendance by a registered graduate, licensed practical or licensed vocational nurse. These services must be required and authorized by the attending physician and must be provided by a person other than you or your spouse, parents, children, siblings or corresponding in-laws. This benefit is not payable if such services are furnished by a nurse or nurses employed by and receiving compensation from the hospital where you or the insured dependent is confined.

J. Anesthesia Benefit — When a surgical operation is performed for the treatment or arrest of cancer, we will pay the actual charges of the anesthesiologist, subject to the maximum shown in the Policy Schedule.

K. Blood, Plasma and Platelets Benefit — Subject to the lifetime maximum shown in the Policy Schedule, we will pay the actual costs of blood, plasma or platelets not donated or replaced.

L. Prosthesis Benefit — We will pay the actual costs incurred, subject to the lifetime maximum shown in the Policy Schedule, for each prosthetic device prescribed as a direct result of surgery for cancer.

M. Transportation Benefit — We will pay the actual costs incurred, subject to the maximum shown in the Policy Schedule, for either (but not both) private passenger or common carrier coach transportation of you or an insured dependent to and from the

nearest facility equipped to provide required treatment if:

- the treatment has been specifically prescribed by the attending physician for the treatment of cancer; and

- the facility is more than 50 miles from the residence of the person receiving treatment.

We will double any common carrier benefit amount paid if you or your spouse accompany the person requiring treatment.

N. Ambulance Benefit — If you or an insured dependent require transportation by air or ground ambulance to and from a hospital for confinement and treatment of cancer, we will pay the actual costs incurred, subject to the maximum shown in the Policy Schedule. The ambulance service must be provided by a licensed or professional ambulance company and must be certified by the attending physician as necessary to protect the health and safety of the Insured Person.

However, if cancer in a newborn dependent child requires the newborn to receive treatment to protect the newborn's health and safety, we will pay actual transportation costs to and from the nearest facility staffed and equipped to treat the newborn's condition, subject to a maximum of not less than $1,000. The transportation must be certified by a physician as necessary to protect the health and safety of the newborn child.

O. Family Member Lodging Benefit — We will pay the actual cost incurred for single room lodging of you or your spouse, subject to the maximum shown in the Policy Schedule, if:

- you or an insured dependent is confined in a hospital for the treatment of cancer;

- the hospital is the nearest facility equipped to provide the necessary treatment as prescribed by a physician;

- the hospital is more than 50 miles from the residence of the person requiring treatment; and

- the lodging is in close proximity to and used for the purpose of being near the person requiring treatment.

P. Extended Care Facility Benefit — We will pay the actual cost incurred while you or an insured dependent is confined in an Extended Care Facility, subject to the maximum shown in the Policy Schedule. Confinement in the Extended Care Facility must begin no later than 14 days following a period of hospital confinement for the treatment of cancer. This benefit is payable for each period of confinement in an Extended Care Facility following a period of hospital confinement. The maximum number of days the benefit is payable shall be the number of days of the immediately preceding hospital confinement.

Q. Hospice Care Benefit — We will pay a benefit for each day you or an insured dependent receives Hospice Care as shown in the Policy Schedule. Such care may be provided while confined in a Hospice Center or at the Insured Person's home. This Hospice Care Benefit is payable if:

- the Insured Person has been diagnosed as terminally ill due to cancer by the attending physician; and

- We receive a written statement from the Hospice Care Facility certifying the days on which care was provided.

## PART 3. LIMITATIONS AND EXCLUSIONS

### CAUSES OTHER THAN CANCER

This policy pays benefits only as a result of a definitive diagnosis of cancer including the direct extension, metastatic spread or recurrence and treatment thereof. This policy does not provide benefits for any other disease, sickness or incapacity.

### WAITING PERIOD

This policy contains a waiting period. The waiting period is shown in the Policy Schedule. No benefits will be paid for cancer first diagnosed before the end of the waiting period except for losses incurred or treatment received at least two

years after the date of diagnosis. The Initial Diagnosis Benefit and Cumulative First Occurrence Benefit will not be paid for cancer first diagnosed before the end of the waiting period.

### TREATMENT OR SERVICES FOR WHICH NO EXPENSES ARE INCURRED

With the exception of the Initial Diagnosis Benefit and the Cumulative First Occurrence Benefit, no benefits will be paid under this policy unless a legal liability exists for the payment of expenses incurred for the treatment or services rendered.

## PART 4. PREMIUM, RENEWABILITY AND TERMINATION PROVISIONS

### GUARANTEED RENEWABLE

After the initial premium is paid, you may continue this policy in force by the timely payment of the renewal premiums. We cannot place any restrictive riders or endorsements on the policy after it has been issued. We cannot refuse to renew the policy if the renewal premiums are paid when due.

The initial premium is shown on Page 3. It is the amount of premium that must be paid on or before the Policy Effective Date. It is based on the insurance provided under this policy including any attached riders, the persons insured and your age on the date of issue.

The renewal premiums will be our premiums in effect for the persons insured on each Premium Due Date based on your age on the date of issue.

"Premium Due Date" means the due date of the next premium for the policy and any attached riders according to the premium payment frequency plan then in effect.

### RIGHT TO CHANGE PREMIUM RATES

We may change our premium rates for all policies of this type, but not more often than once every twelve months. If we change our rates, the change will apply to all policies of this type in the state where you live. We will give you at least 31 days prior written notice of any change. We will mail the notice to your last known address. The effective date of the change will be the Premium Due Date.



on or next following the end of the 31 day notification period.

### PREMIUM PAYMENTS

All premium payments are due and payable in advance of the period to which they apply. All premiums are payable to us at our Home Office or to an authorized agent in accordance with the premium payment frequency plan elected. If you so request, we will give you a receipt for each payment received, signed by one of our officers.

The premiums due will include the cost of insurance provided by the policy and any attached riders.

### CHANGES IN PAYMENT FREQUENCY

The premium payment frequency plan is the one elected by you in the application. You may change the frequency plan for future payments on any Premium Due Date by paying the appropriate premium then due for the desired frequency.

### GRACE PERIOD

The "Grace Period" is the period of time after a Premium Due Date that we allow for the payment of the premium then due. After the initial premium is paid, we allow a 31 day Grace Period for the payment of each subsequent premium due. During a Grace Period, the insurance provided by the policy, including any attached riders, will remain in force. If the premium due is not paid by the end of the Grace Period, the insurance, provided will terminate.

### TERM

Insurance provided under this policy begins at 12:01 A.M. Standard Time at the place where you reside on the Policy Effective Date shown on Page 3. Subject to the Grace Period provision, coverage will end at 12:01 A.M. Standard Time on the next or any subsequent Premium Due Date unless continued by the timely payment of premium. Termination of the policy will not act to void or reduce a claim for any benefits payable prior to the date of termination.

### REINSTATEMENT

If a premium due is not paid and the policy terminates, you may request that the policy be reinstated by submitting the premium due to us at

  

our Home Office. If we accept the premium submitted without requiring an application for reinstatement, the policy will be deemed reinstated on the date we receive the premium payment.

If we require an application but fail to give you a receipt for the premium submitted, the policy will be deemed reinstated on the date we receive the premium payment. However, if we require an application and give you a receipt, the policy will be deemed reinstated on the date of receipt if:

* we approve your application; or

* we fail to give you written notice of our disapproval within 45 days after we receive your application.

If the policy is reinstated, the benefits provided will be payable only for losses incurred or treatment begun more than 10 days after the date of reinstatement.

In all other respects, the insurance provided will remain the same, subject to any limitations we may place on such insurance as a condition of reinstatement. We will give you written notice of any such limitations.

## PART 5. CLAIM PROVISIONS

### NOTICE OF CLAIM

Written notice of claim must be given to us within 30 days after the start or occurrence of any loss covered by the policy or as soon thereafter as is reasonably possible. Notice given by you or on your behalf to our Home Office in Dallas, Texas with information sufficient to identify the person insured will be deemed notice to us.

### CLAIM FORMS

Upon receipt of a notice of claim, we will send you the forms we require for filing proof of loss. If we fail to furnish such forms within 10 days after we receive notice of a claim, our proof of loss requirements will be met if we are notified in writing of the nature and extent of the loss or treatment for which benefits are claimed. This information must be given to us within the time period for filing proof of loss.

### PROOF OF LOSS

Written proof of loss must be given to us at our Home Office within 90 days after the date of the loss. Failure to furnish us such proof within 90 days will not void or reduce any claim if:

* it was not reasonably possible to do so; and

* proof is given as soon as reasonably possible thereafter.

In any event, however, proof of loss must be provided us within one year after the loss unless you lack the legal capacity to do so.

### PAYMENT OF BENEFITS

Benefits for any loss covered by this policy will be paid immediately upon our receipt of satisfactory written proof of loss. All benefits will be paid directly to you if living. Any benefits remaining unpaid at your death will be paid to your spouse, if any; otherwise to your estate.

### FACILITY OF PAYMENT

If benefits become payable to your estate or to anyone who is not legally competent to give us a valid release, we may pay up to $1,000 in benefits to one of your relatives (by blood or marriage) whom we deem to be reasonably entitled thereto. Any such payment made in good faith by us will relieve us of all liability to the extent of the payment.

### MEDICAL EXAMINATION/AUTOPSY

We have the right, at our expense, to have anyone on whom a claim is based be examined by a physician of our choice during the pendency of a claim. We also have the right, at our expense, to have an autopsy performed on anyone on whom a claim is based, unless forbidden by law.

### ACTION AT LAW

No action at law or in equity may be brought to recover on this policy until 60 days after proper written proof of loss has been given to us. No such action may be brought at all after a period of three years from the time such proof is required to be furnished (6 years in Kansas; after the applicable statute of limitations in Florida).

## PART 6.  OTHER POLICY PROVISIONS

### ENTIRE CONTRACT/CHANGES

The entire contract of insurance consists of:

• the ... this policy form, including any attached riders, ... or endorsements; and

• ... your application, a copy of which is attached.

No one, except one of our executive officers, may change, waive or otherwise alter any of the terms or conditions of this policy. Any change must be made in writing and must be signed by one of our officers. No agent may change, waive or otherwise alter the terms or conditions of the policy.

### LIMITS ON OUR CONTESTING

We rely on the statements made in the application as a basis to issue the policy and any attached riders. These statements, in the absence of fraud, are deemed representations and not warranties. No statement may be used by us as a basis for contesting a claim or voiding the insurance provided by the policy unless it is contained in the application.

Further, we cannot contest any statements made in the application, except fraudulent misstatements, after coverage has been in force for two years.

### MISSTATEMENT OF AGE

If the age of an Insured Person has been misstated on the application, we will adjust any benefits that become payable. Any excess premium received by us will be refunded. Any underpayment of premium will be deducted from the benefit amount.

No insurance is provided any person under the policy whose age has been misstated on the application, if on the basis of the correct age, we:

• would not have provided coverage under the policy; or



• would not have accepted a premium for the insurance.

In either case, our liability is limited to a return of the premiums paid for the period not covered.

### OWNER/CHANGE OF OWNERSHIP

Unless otherwise noted on the application, you are the owner of this policy. You may transfer ownership to someone else anytime while the policy is in force.

To transfer ownership, you must file a written request with us at our Home Office on a form acceptable to us. The transfer will be effective from the date the request is signed by you, or later if you so indicate, upon receipt by us. We will not be liable for any action taken by us under the terms of this contract prior to the date we receive the signed request.

### ASSIGNMENT

Benefits payable under this policy may be assigned to a third party. A signed copy of the written assignment must be sent to us at our Home Office. The assignment will take effect when signed, subject to any actions we may take prior to our receipt of the assignment. We assume no responsibility for the validity of any assignment.

### OTHER INSURANCE WITH US

If any person covered under this policy is also insured under another like policy with us, the coverage provided by only one of the policies will be effective. We will refund any premiums paid for duplicate coverage.

### CONFORMITY WITH STATE STATUTES

If, on the Effective Date, any provisions of this policy are in conflict with the laws of the state where issued, it is deemed amended to conform to the minimum requirements of such laws.

## PART 7. SURGICAL SCHEDULE

To determine the maximum amount payable for any operation, multiply the Surgical Value for that operation in the Schedule below by the Surgical Benefit Factor shown on Page 3. Surgical Values are based on the 1974 revision of the California Relative Value Schedule.

| | SURGICAL VALUE | | SURGICAL VALUE |
|---|---|---|---|
| **ABDOMEN** | | **INTESTINES** | |
| Paracentesis | $60 | Sigmoidoscopy | $75 |
| Exploratory Laparotomy | $300 | | |
| Cholecystectomy | $400 | **KIDNEY** | |
| | | Nephrectomy | $575 |
| **BLADDER** | | | |
| Cystoscopy | $75 | **LIVER** | |
| Cystectomy | | Needle Biopsy | $75 |
| Partial | $500 | Wedge Biopsy | $150 |
| Complete | $875 | Resection of Liver | $500 |
| TUR Bladder Tumors | $300 | | |
| | | **LYMPHATIC** | |
| **BRAIN** | | Excision of Lymph Node | $100 |
| Exploratory Craniotomy | $650 | Splenectomy | $400 |
| Burr Holes Not Followed By Surgery | $175 | Axillary Node Dissection | $400 |
| Excision Of Brain Tumor | $1,000 | Lymphadenectomy | |
| | | Unilateral | $400 |
| **BREAST** | | Bilateral | $500 |
| Needle Biopsy | $75 | | |
| Cutting Operation Biopsy | $150 | **MOUTH** | |
| Mastectomy | | Hemiglossectomy | $200 |
| Simple | $400 | Glossectomy | $400 |
| Radical | $600 | Resection of Palate | $400 |
| Lumpectomy | $200 | Tonsil/Mucus Membrane | $325 |
| | | | |
| **CERVIX** | | **PANCREAS** | |
| D&C | $100 | Jejunostomy | $500 |
| Colposcopy | $100 | Pancreatectomy | $1,300 |
| Vaginal Hysterectomy | $325 | Whipple Procedure | $1,300 |
| Abdominal Hysterectomy | $425 | | |
| Total Hysterectomy With Radical | | **PENIS** | |
| Lymphadenectomy | $1,000 | Amputation | |
| | | Partial | $150 |
| **CHEST** | | Complete | $275 |
| Thoracentesis | $50 | Radical | $375 |
| Bronchoscopy | $175 | | |
| Mediastinoscopy | $175 | **PROSTATE** | |
| Thoracotomy | $400 | Cystoscopy | $75 |
| Pneumonectomy | $750 | TUR Prostate | $300 |
| Wedge Resection | $600 | Radical Prostatectomy | $750 |
| Lobectomy | $700 | | |
| | | **SKIN** | |
| **ESOPHAGUS** | | Excision of Lesion of Skin | $30 |
| Esophagoscopy | $150 | | |
| Resection of Esophagus | $950 | **SPINE** | |
| Esophagogastrectomy | $750 | Laminectomy | $500 |
| | | Cordotomy | $325 |



|  | SURGICAL VALUE |
| --- | --- |
| **STOMACH** | |
| Gastroscopy .................... | $150 |
| Partial Gastrectomy ............. | $500 |
| Gastrectomy .................... | $825 |
| Gastrojejunostomy .............. | $500 |
| Proctosigmoidoscopy ........... | $75 |
| Colonoscopy ................... | $150 |
| Colostomy .................... | $200 |
| Ileostomy .................... | $200 |
| Colectomy .................... | $500 |
| Resection Of Small Intestine ....... | $550 |
| **TESTIS** | |
| Radical Orchiectomy ........... | $265 |

|  | SURGICAL VALUE |
| --- | --- |
| **THROAT** | |
| Laryngoscopy ................ | $200 |
| Laryngectomy | |
|    Without Neck Disection ....... | $600 |
|    With Neck Dissection ........ | $1,300 |
| Tracheostomy ................ | $200 |
| **THYROID** | |
| Thyroidectomy | |
|    Partial (One Lobe) ......... | $325 |
|    Total (Both Lobes) .......... | $425 |
| Thyroidectomy With Radical Neck | |
|    Dissection ............... | $925 |
| **VULVA** | |
| Vulvectomy | |
|    Partial .................... | $275 |
|    Radical ................... | $500 |

If any operation for the treatment of cancer is performed other than those listed, we will pay an amount comparable to the amount shown for the operation most nearly similar in severity and gravity.

## GREAT AMERICAN RESERVE INSURANCE COMPANY
2020 Live Oak, P. O. Box 388, Dallas, TX 75221

### DREAD DISEASE BENEFIT RIDER

### Benefit Provision

We will pay benefits for expenses incurred and care or treatment received or begun while this Rider is in force if:

* you or an insured dependent is diagnosed by a physician as having one or more dread disease as defined herein;

* the diagnosis is first made after the Effective Date of this Rider; and

* the expenses incurred and care or treatment rendered is a result of the dread disease.

Such benefits will be the same as those payable under the Policy as a result of cancer and will be applied to and serve to meet the benefit maximums stated in the Policy Schedule. In no case will the total benefits paid under this Rider and the Policy exceed the benefit maximums for cancer treatment.

"Dread Disease" means any of the following:

| | |
|---|---|
| Addison's Disease | Reyes' Syndrome |
| Amyotrophic Lateral Sclerosis | Rheumatic Fever |
| | Rocky Mountain |
| Bubonic Plague | Spotted Fever |
| Cystic Fibrosis | Scarlet Fever |
| Diphtheria | Sickle Cell |
| Encephalitis | Anemia |
| Epilepsy | Smallpox |
| Hansen's Disease | Tay-Sachs |
| Lupus Erythematosus | Disease |
| Meningitis | Tetanus |
| Multiple Sclerosis | Toxic Epidermal |
| Muscular Dystrophy | Necrolysis |
| Myasthenia Gravis | Tuberculosis |
| Niemann-Pick Disease | Tularemia |
| Osteomyelitis | Typhoid Fever |
| Poliomyelitis | Undulant Fever |
| Rabies | Whipple's Disease |

"Policy" means the Cancer Insurance Policy to which this Rider is attached and made a part of.

### Effective Date

The Effective Date of this Rider is the Effective Date of the Policy to which it is attached as shown on the Policy Information Page. The Waiting Period defined in the Policy applies to this Rider.

### Termination

Coverage provided by this Rider will terminate on the sooner of:

* the date you request to terminate coverage under the Rider; or

* the date the Policy terminates.

Except as otherwise provided above, benefits payable under this Rider are subject to the terms and provisions of the Policy to which it is attached.

*J. R. Wood Jr.*
Secretary

## GREAT AMERICAN RESERVE INSURANCE COMPANY
2020 Live Oak; P. O. Box 388, Dallas, TX 75221

### INTENSIVE CARE BENEFIT RIDER

#### Benefit Provision

We will pay a benefit for each day you or an insured dependent is continuously confined in an intensive care unit (ICU) for medically necessary treatment of an accidental injury or sickness, subject to a maximum of 30 days for each period of confinement. Confinement must commence while this Rider is in force. The benefit amount is elected by you and is shown in the Policy Schedule. We will also pay the actual cost of ambulance transportation of the Insured Person to and from the hospital where confined provided:

- the ambulance service is provided by a licensed or professional ambulance company; and

- such transportation is certified by the attending physician as necessary to protect the health and safety of the Insured Person.

#### Definitions

"Confined" means care and treatment in an intensive care unit for at least 12 hours to include an overnight stay. Two or more separate periods of ICU confinement for the same cause or causes will be considered to be one continuous period of confinement if separated by less than 30 days.

"Intensive Care Unit" means an area or unit of a hospital which at the time of admission is separate and apart from the surgical recovery room and from other general service rooms, beds and wards. In addition, to be considered an Intensive Care Unit, such facility must

- provide constant, 24-hour nursing attendance by Registered Nurses assigned on an exclusive, full-time basis;

- be under the direction and/or supervision of a full-time physician or a standing "intensive care" committee of the medical staff; and

- contain special apparatus used in the treatment of the critically ill.

An ICU includes intensive cardiac or coronary units and neo-natal intensive care units. Not included in the definition of an ICU are:

- progressive care units;

- sub-acute intensive care units;

- intermediate care units;

- private monitored rooms;

- observation units;

- step-down units; or

- any other lesser care units.

"Policy" means the Cancer Treatment Insurance Policy to which this Rider is attached and made a part of.

#### Exclusions and Limitations

No benefits are payable under this Rider for any ICU confinement caused by or resulting from:

- alcoholism or drug addiction;

- intoxication or being under the influence of drugs not prescribed or recommended by a Physician;

- an attempted suicide or intentional self-inflicted injury;

- the commission of a felony or attempt thereof; or

- any confinement or medical treatment for which you or the insured dependent is not legally obligated to pay or for which no charge would have been made in the absence of the insurance provided by this Rider.

22-6126(09-86)

ICN 26-1261-00

## Effective Date

The Effective Date of this Rider is the Effective Date of the Policy to which it is attached as shown on the Policy Information Page. The Waiting Period defined in the Policy applies to this Rider.

## Reinstatement

If this Rider is reinstated pursuant to the provisions of the Policy to which it is attached, benefits will be payable for:

* accidental injuries occurring on or after the day after the date of reinstatement; and

* losses incurred or confinement begun for sickness more than 10 days after the date of reinstatement.

## Termination

Coverage provided by this Rider will terminate on the sooner of:

* the date you request to terminate coverage under the Rider;

* the date the Policy terminates; or

* with respect to each Insured Person under the Policy, upon attainment of age 70.

Except as otherwise provided above, benefits payable under this Rider are subject to the terms and provisions of the Policy to which it is attached.

*J. R. Wood Jr.*
Secretary

22-0⁴²6.09-861

**GREAT AMERICAN RESERVE INSURANCE COMPANY**
2020 Live Oak P.O. Box 284, Dallas, Texas 75221
**APPLICATION FOR CANCER TREATMENT INSURANCE POLICY**

1096860

**1. APPLICANT**

| | | |
|---|---|---|
| Insured's Name | Debra Neale | Social Security No. 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 | Age 35 | Date of Birth 5-4-86 | ☐ Male ☑ Female |
| Address PO Box 1093 Van Alstyne, TX | Telephone No. (214) 482-5568 |
| Name of Spouse Hugh Neale | No. 33 | Date of Birth 7-17-56 | ☐ Plan 1 ☐ Plan 2 |

If applying for Family Coverage give names of Children and Dates of Birth

Brandi Neale 12-2-81

**D. PLAN OF INSURANCE –** ☐ APPLICANT COVERAGE ONLY    ☑ FAMILY COVERAGE

| | | |
|---|---|---|
| PLAN C | INDICATE | INITIAL PREMIUM 15.99 |
| OPTIONAL RIDERS | | |
| Direct Disease Benefit Rider | ☑ Yes ☐ No | INITIAL PREMIUM 3.00 |
| Intensive Care Benefit Rider (If "Yes" indicate intensive Care Benefit Desired) | ☑ Yes ☐ No | INITIAL PREMIUM 6.00 |
| ☐ $100 ☐ $200 ☑ $300 ☐ $400 ☐ $500 ☐ $600 | | |
| | | TOTAL PREMIUM 24.99 |

PREMIUM MODE  ☑ Monthly (PAC/DEB)  ☐ Semi-Annually  ☐ Quarterly  ☐ Annually  ☐ Other (Specify)

**2. REPRESENTATIONS** (If additional space is needed attach a separate sheet of paper signed and dated.)

A. Has any person to be insured ever had, been treated for or diagnosed as having, Cancer in any form other than Skin Cancer, Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? (If "yes" indicate name of person. This person will not be covered under the policy or any attached riders.)  ☐ Yes  ☑ No

B. Has any person to be insured ever had Skin Cancer? (If "yes" indicate name of person and submit physician's statement including pathology report with this application.)  ☐ Yes  ☑ No

C. (Answer only if applying for Dread Disease Rider) Has any person to be insured ever had been treated for or diagnosed as having Cystic Fibrosis, Diphtheria, Encephalitis, Epilepsy, Meningitis, Multiple Sclerosis, Muscular Dystrophy, Osteomyelitis, Poliomyelitis, Rabies, Rheumatic Fever, Rocky Mountain Spotted Fever, Scarlet Fever, Sickle Cell Anemia, Smallpox, Tetanus, Tuberculosis, Tularemia, or Typhoid Fever? (If "yes" indicate name of person, disease, date(s) of treatment and degree of recovery.)  ☐ Yes  ☑ No

D. (Answer only if applying for Intensive Care Rider) Has any person to be insured ever had been treated for or diagnosed as having coronary artery disease, a heart attack, stroke, heart murmur or other disease or disorder of the heart including a heart abnormality? (If "yes" indicate name of person. That person will not be covered under this rider.)  ☐ Yes  ☑ No

Will this policy replace any health insurance you now have with this or any other company? (If "yes" complete appropriate replacement form)  ☑ Yes  ☐ No

I have read, or have had read to me the completed application. The answers to questions appearing hereon are true and complete to the best of my knowledge and belief. I realize that any false statement, or misrepresentation related to the risk may result in loss of coverage, subject to policy limits on contestability. I understand that no insurance will take effect until this application is accepted, the initial premium is paid and a policy is issued. I also acknowledge receipt of the Outline of Coverage applicable to this policy. No person to be insured is covered by Title XVIII (Medicaid) of any cancer program.

Signed at __Allen__ __TX__        on __12-31-99__

Signature __Debra Neale__

**FOR AGENT** To the best of your knowledge and belief, is there a replacement in involved in this transaction?  ☑ Yes  ☐ No

__Mary Sue Walker 10111__        __10-31-99__        __Mary Sue Walker__
Agent's Name & No.                    Date                    Agent's Signature

22-004010/1-491

# EXHIBIT 2

Jefferson National Life Insurance Company
PO Box 2024
Carmel IN 46082-2024

(800) 525-7662

June 1, 2022

Debra Veale
PO Box 1043
Van Alystyne, TX 75495

Patient Name:      Hugh Veale
Policy Number:     01A1096860
Claim Number:      B-678570-01

Dear Hugh Veale:

We have received and reviewed the claim for the above referenced policy.

In order to consider benefits we need a copy of the Medicare Explanation of Benefits/other insurance Explanation of Benefits showing the actual incurred expenses (amount left after the other insurance paid) for the 2-3-22 diagnostic lab expense and the 3-11-22 to 4-29-22 chemotherapy expenses.

If you have any questions, please contact us at 1-800-525-7662 Monday through Friday between the hours of 8 a.m. and 6 p.m. Eastern Time. One of our customer service representatives would be pleased to assist you.

Sincerely,

Customer Service

# EXHIBIT 3

Jefferson National Life Insurance Company
P. O. Box 2024
Carmel, IN 46082
(800) 264-3300

JEFFERSON NATIONAL

June 9, 2022

00108

Debra Veale
PO Box 1043
Van Alstyne, TX 75495

Patient Name:        Hugh Veale
Policy Number:       01A1096860
Claim Number:        B-678570-01

Dear Debra Veale:

Thank you for the opportunity to serve your insurance needs.

We have received and reviewed your request for the above
referenced policy/contract.

This is in response to your appeal on the above listed claim. Your
policy states "No benefits will be paid under this policy unless a
legal liability exists for the payment of expenses incurred for
the treatment of services rendered." So, if other insurance has
paid your providers, there are no expenses incurred for this
insurance policy.

We have based our determination on all the information currently
available to us. If you have other information you would like us
to consider, please send it, in writing, to the address listed
above. When we receive it, we will review it promptly and provide
you with a written decision.

If you have any questions, please contact us at (800) 525-7662
Monday through Friday between the hours of 8 a.m. and 6 p.m.
Eastern Time. One of our customer service representatives would be
pleased to assist you.

Sincerely,

Tim Powers
Claim Review

HCL0927
TIP

# EXHIBIT 4

Jefferson National Life Insurance Company
PO Box 2024
Carmel IN 46082-2024

(800) 525-7662

July 20, 2022

Debra Veale
PO BOX 1043
VAN ALSTYNE, TX 75495

Patient Name:        Hugh Veale
Policy Number:       01A1096860

Dear J. Mark Mann:

This is in response to your correspondence dated June 22, 2022. Our records show that the Initial Occurrence benefit of $750.00 was previously paid for Hugh Veale on August 12, 1997, based on a diagnosis made on December 14, 1993. The Positive Diagnosis Test benefit was also paid at that time. These benefits are payable once per insured.

Surgery and Anesthesia benefits for the surgical procedure on March 4, 2022 were paid based on the billing documentation submitted with your correspondence. For consideration of chemotherapy benefits, we are in need of the Medicare or other insurance Explanation of Benefits. The correspondence sent to Debra is enclosed for review.

A duplicate policy has been sent to the policyholder under separate cover and is enclosed as well.

If you have any questions, please contact us at 1-800-525-7662 Monday through Friday between the hours of 8 a.m. and 6 p.m. Eastern Time. One of our customer service representatives would be pleased to assist you.

Sincerely,

*Dustin Williams*
Claims Review

Enclosures
Cc:
J. Mark Mann
MT2 Law Group
201 E HOWARD ST
HENDERSON, TX 75654

# **EXHIBIT 5**

JEFFERSON NATIONAL LIFE INSURANCE COMPANY
11825 N. Pennsylvania Street
P.O. BOX 2012
Carmel, IN 46082-2012
1800-824-2726


JEFFERSON NATIONAL

**EXPLANATION OF BENEFITS**

| POLICYHOLDER'S NAME AND ADDRESS | INSURED'S NAME |
|---|---|
| DEBRA VEALE | DEBRA VEALE |
| PO BOX 1043 | PATIENT'S NAME |
| VAN ALSTYNE    TX 75495 | HUGH VEALE |

| B-678618-01 | MEMBER I.D. | POLICY NO. | DATE PAID |
|---|---|---|---|
| | 1A1096860 | CANC-C | 08/12/22 |

## BENEFITS

| PROVIDER | SERVICE FROM | SERVICE TO | TOTAL CHG. OR INDEM. AMT. | DEDUCTIBLE OR ELIM. DAYS | AMOUNT NOT COVERED | NO SERV. | % PAID | RE-MARK CODE | CONSIDERED | PAID | BENEFITS CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UT SOUTWES | 02/03 | 02/03/22 | .09 | | .09 | 01 | 000 | M8 | | | 91 |
| UT SOUTWES | 03/11 | 04/29/22 | .09 | | .09 | 01 | 000 | L8 | | | 07 |
| KUMAR MD | 03/04 | 03/04/22 | .09 | | .09 | 01 | 000 | P2 | | | 04 |
| UHS OF TEX | 04/08 | 04/08/22 | .09 | | .09 | 01 | 000 | 20 | | | 91 |
| UT SOUTWES | 03/25 | 03/25/22 | .09 | | .09 | 01 | 000 | B8 | | | 07 |
| UT SOUTWES | 04/15 | 04/15/22 | .09 | | .09 | 01 | 000 | B8 | | | 07 |

| | TOTAL AMOUNT PAID THIS CLAIM | 0.00 |
|---|---|---|

## CHECKS ISSUED

## DESCRIPTION OF REMARKS

THIS IS A SUPPLEMENTAL HEALTH POLICY AND ONLY THOSE BENEFITS
LISTED IN THE POLICY ARE PAYABLE.
M8 - MAXIMUM BENEFITS HAVE BEEN PAID
L8 - THIS FILE HAS BEEN CLOSED DUE TO NO RESPONSE FOR REQUESTED
L9 - INFORMATION.RECEIPT OF THE INFORMATION WILL REOPEN THE FILE
P2 - BENEFITS FOR THESE EXPENSES HAVE PREVIOUSLY BEEN CONSIDERED
20 - THIS CHARGE IS NOT COVERED UNDER THE POLICY.
B8 - PART OF THE DENIED AMOUNT WAS APPROVED BY MEDICARE HOWEVER
B9 - MEDICARE PAID AT 100%.

ACTION TAKEN ON YOUR CLAIM IS BASED UPON THE INFORMATION CONTAINED IN OUR RECORDS, IF YOU WOULD LIKE TO SUBMIT
ADDITIONAL INFORMATION, PLEASE FEEL FREE TO DO SO.    "REFER TO BACK FOR EXPLANATION OF BENEFIT CODES"

04-8637
INDIVIDUAL COPY                                                        EXAMINER - NCO

## BENEFIT CODE EXPLANATION

| | |
|---|---|
| 01  Room and Board | 44  Day Surg. X-Ray & Lab |
| 02  ICU-CCU | 45  Dental (Injury Only or Tumors in Mouth |
| 03  Misc. I.P. Expense | 46  Asst. Surgeon |
| 04  Surgery | 47  Pre-Admit Testing |
| 05  Anesthia | 48  Limited O.P. Treatment |
| 06  NACA Other Treatment, Services or Supplies Expense | 49  O.P. Treatment (Other) |
| 07  O.P. Therapy | 50  Total Disability Reduced Benefit |
| 08  Doctor Visits | 51  E&E Life |
| 09  Spinal Manipulations | 55  Major Medical |
| 10  O.P. Surgery | 57  Semi-Private R&B Supp. |
| 11  Emergency Treatment | 58  Private R&B Supp. |
| 12  O.P. X-Ray & Lab | 59  Semi-Private R&B |
| 13  Maternity | 60  Private R&B |
| 18  Blood | 63  IP Detox |
| 19  Ambulance | 64  ECF - Misc. |
| 23  Accidental Death | 65  Extra Confinement |
| 24  A.D. (Common Carrier) | 66  O.P. Misc. Hosp. Expense A (100) |
| 25  Dismemberment | 67  I.P. Medical Benefit |
| 27  Hospital Confinement (Indemnity) | 68  Annuities |
| 27A  HCIP/Ambulance | 68A  Annuity Deposit Fund |
| 27C  HCIP/Comm. Acc. | 69  O.P. Misc. Hosp. Expense B (50) |
| 27D  HCIP/Dep. Child | 72  Limited Inpatient Care |
| 271  HCIP/ICU-CCU | 73  Other |
| 32  Medical Expense | 75P  Disability Income |
| 34  Life | 76  Limited |
| 34A  Group Death Benefit | 78  Limited Misc. Hospital |
| 34C  Dep. Life Child | 80  Premium Refund / Withholding |
| 34M  Dependent Life | 82  I. P. Rehab. |
| 34O  Other Insured Rider | 83  Limited Room * Board |
| 34S  Dep. Life Spouse | 84  Limited ICU |
| 35  Convalescent Hosp/ECF | 85  Limited Ambulance |
| 36  Misc. Out of Hospital Med. Serv. & Supplies | 86  Limited Dr Visits |
| 37  Prescription Drugs | 87  Limited Prescriptions |
| 38  Private Nursing Care | 88  Limited P.O.N. |
| 39  Prosthetic Devices & Medical Supplies | 91  Miscellaneous |
| 40  Interest | 91C  Cumulative Benefit |
| 41  Day Surg. Hospital | 911  Initial Diagnosis |
| 42  Day Surg. Doctor Charge | 92  Policy Loan |
| 43  Day Surg. Anes. | 93  Comp Settlement |
| | 100  Physcal Therapy |
| | 101  Casts, Splints, Etc. |

### FOR ARIZONA RESIDENTS ONLY

You are entitled to appeal this decision under Arizona laws. Please contact our customer service department at 1-800-824-2726.

### FOR NEW HAMPSHIRE RESIDENTS ONLY

If you have any questions regarding this determination, or if you would like to appeal this determination, please contact our customer service department at 1-800-824-2726. The New Hampshire Insurance Department may be contacted for assistance.

### FOR ILLINOIS RESIDENTS ONLY

"Rule 9.19 of the Rules and Regulations of the Illinois Department of Insurance requires that our Company advise you that if you wish to take this matter up with the Illinois Department of Insurance it maintains a Consumer Division in Chicago at 160 North LaSalle Street, Chicago, Illinois 60606, and in Springfield at 320 West Washington Street, Springfield, Illinois 62767."

### FOR CALIFORNIA RESIDENTS ONLY

"Subchapter 7.5 Unfair Claims Settlement Practices Regulations requires that our Company advise you that if you wish to take this matter up with the California Department of Insurance it maintains a Consumer Division in Los Angeles at 300 South Spring Street, Los Angeles, California 90013 or call 1-800-927-4357."

### FOR ALL OTHER STATES

This is to advise you that we have a grievance process in place. You may inquire into this process by calling 1-800-824-2726.

# EXHIBIT 6

Jefferson National Life Insurance Company
PO Box 2024
Carmel IN 46082-2024

(800) 525-7662

September 21, 2022

Debra Veale
PO Box 1043
Van Alstyne TX 75495

Patient Name:        Hugh Veale
Policy Number:       01A1096860
Claim Number:        B-678723-01

Dear Debra Veale:

We have received and reviewed the claim for the above referenced policy.

In order to further consider benefits we need a copy of the 7-6-22 pathology report and operative report, form UB-04 for the 7-11-22 to 7-20-22 and 7-25-22 to 7-29-22 hospital stays, and form CMS-1500/bill with doctor name and diagnosis code(s) for the 7-11-22 to 7-14-22, 7-18-22, and 7-25-22 to 7-26-22 inpatient attending physician visits. We also need the other insurance or Medicare explanation of benefits showing the actual incurred expense remaining after the other insurance or Medicare has considered the expenses for these attending physician visits.

If you have any questions, please contact us at 1-800-525-7662 Monday through Friday between the hours of 8 a.m. and 6 p.m. Eastern Time. One of our customer service representatives would be pleased to assist you.

Sincerely,

Customer Service

# EXHIBIT 7

JEFFERSON NATIONAL LIFE INSURANCE COMPANY
11825 N. Pennsylvania Street
P.O. BOX 2012
Carmel, IN 46082-2012
1800-824-2726



**EXPLANATION OF BENEFITS**

| POLICYHOLDER'S NAME AND ADDRESS | INSURED'S NAME |
|---|---|
| DEBRA VEALE<br>PO BOX 1043<br>VAN ALSTYNE    TX 75495 | DEBRA VEALE |
| | PATIENT'S NAME |
| | HUGH VEALE |

| B-678723-01 | MEMBER I.D.<br>1A1096860 | POLICY NO.<br>CANC-C | DATE PAID<br>10/27/22 |
|---|---|---|---|

## BENEFITS

| PROVIDER | SERVICE FROM | SERVICE TO | TOTAL CHG. OR INDEM. AMT. | DEDUCTIBLE OR ELIM. DAYS | AMOUNT NOT COVERED | NO SERV. | % PAID | RE-MARK CODE | CONSIDERED | PAID | BENEFITS CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MANSOUR MD | 07/06 | 07/06/22 | .09 | | .09 | 01 | 000 | L8 | | | 05 |
| CLEMENTS U | 07/11 | 07/20/22 | .09 | | .09 | 09 | 000 | L8 | | | 01 |
| CLEMENTS U | 07/25 | 07/29/22 | .09 | | .09 | 04 | 000 | L8 | | | 01 |
| CLEMENTS U | 07/11 | 07/14/22 | .09 | | .09 | 04 | 000 | L8 | | | 08 |
| CLEMENTS U | 07/18 | 07/18/22 | .09 | | .09 | 01 | 000 | L8 | | | 08 |
| CLEMENTS U | 07/25 | 07/26/22 | .09 | | .09 | 02 | 000 | L8 | | | 08 |

| TOTAL AMOUNT PAID THIS CLAIM | 0.00 |
|---|---|

## CHECKS ISSUED

## DESCRIPTION OF REMARKS

```
L8 - THIS FILE HAS BEEN CLOSED DUE TO NO RESPONSE FOR REQUESTED
L9 - INFORMATION.RECEIPT OF THE INFORMATION WILL REOPEN THE FILE
```

ACTION TAKEN ON YOUR CLAIM IS BASED UPON THE INFORMATION CONTAINED IN OUR RECORDS. IF YOU WOULD LIKE TO SUBMIT
ADDITIONAL INFORMATION, PLEASE FEEL FREE TO DO SO.    "REFER TO BACK FOR EXPLANATION OF BENEFIT CODES"
04-8637
INDIVIDUAL COPY                                                    EXAMINER - NCC

## BENEFIT CODE EXPLANATION

| | |
|---|---|
| 01 | Room and Board |
| 02 | ICU-CCU |
| 03 | Misc. I.P. Expense |
| 04 | Surgery |
| 05 | Anesthia |
| O6 | NACA Other Treatment, Services or Supplies Expense |
| 07 | O.P. Therapy |
| 08 | Doctor Visits |
| 09 | Spinal Manipulations |
| 10 | O.P. Surgery |
| 11 | Emergency Treatment |
| 12 | O.P. X-Ray & Lab |
| 13 | Maternity |
| 18 | Blood |
| 19 | Ambulance |
| 23 | Accidental Death |
| 24 | A.D. (Common Carrier) |
| 25 | Dismemberment |
| 27 | Hospital Confinement (Indemnity) |
| 27A | HCIP/Ambulance |
| 27C | HCIP/Comm. Acc. |
| 27D | HCIP/Dep. Child |
| 271 | HCIP/ICU-CCU |
| 32 | Medical Expense |
| 34 | Life |
| 34A | Group Death Benefit |
| 34C | Dep. Life Child |
| 34M | Dependent Life |
| 34O | Other Insured Rider |
| 34S | Dep. Life Spouse |
| 35 | Convalescent Hosp/ECF |
| 36 | Misc. Out of Hospital Med. Serv. & Supplies |
| 37 | Prescription Drugs |
| 38 | Private Nursing Care |
| 39 | Prosthetic Devices & Medical Supplies |
| 40 | Interest |
| 41 | Day Surg. Hospital |
| 42 | Day Surg. Doctor Charge |
| 43 | Day Surg. Anes. |
| 44 | Day Surg. X-Ray & Lab |
| 45 | Dental (Injury Only or Tumors in Mouth |
| 46 | Asst. Surgeon |
| 47 | Pre-Admit Testing |
| 48 | Limited O.P. Treatment |
| 49 | O.P. Treatment (Other) |
| 50 | Total Disability Reduced Benefit |
| 51 | E&E Life |
| 55 | Major Medical |
| 57 | Semi-Private R&B Supp. |
| 58 | Private R&B Supp. |
| 59 | Semi-Private R&B |
| 60 | Private R&B |
| 63 | IP Detox |
| 64 | ECF - Misc. |
| 65 | Extra Confinement |
| 66 | O.P. Misc. Hosp. Expense A (100) |
| 67 | I.P. Medical Benefit |
| 68 | Annuities |
| 68A | Annuity Deposit Fund |
| 69 | O.P. Misc. Hosp. Expense B (50) |
| 72 | Limited Inpatient Care |
| 73 | Other |
| 75P | Disability Income |
| 76 | Limited |
| 78 | Limited Misc. Hospital |
| 80 | Premium Refund / Withholding |
| 82 | I. P. Rehab. |
| 83 | Limited Room ' Board |
| 84 | Limited ICU |
| 85 | Limited Ambulance |
| 86 | Limited Dr Visits |
| 87 | Limited Prescriptions |
| 88 | Limited P.O.N. |
| 91 | Miscellaneous |
| 91C | Cumulative Benefit |
| 911 | Initial Diagnosis |
| 92 | Policy Loan |
| 93 | Comp Settlement |
| 100 | Physcal Therapy |
| 101 | Casts, Splints, Etc. |

### FOR ARIZONA RESIDENTS ONLY

You are entitled to appeal this decision under Arizona laws. Please contact our customer service department at 1-800-824-2726.

### FOR NEW HAMPSHIRE RESIDENTS ONLY

If you have any questions regarding this determination, or if you would like to appeal this determination, please contact our customer service department at 1-800-824-2726. The New Hampshire Insurance Department may be contacted for assistance.

### FOR ILLINOIS RESIDENTS ONLY

"Rule 9.19 of the Rules and Regulations of the Illinois Department of Insurance requires that our Company advise you that if you wish to take this matter up with the Illinois Department of Insurance it maintains a Consumer Division in Chicago at 160 North LaSalle Street, Chicago, Illinois 60606, and in Springfield at 320 West Washington Street, Springfield, Illinois 62767."

### FOR CALIFORNIA RESIDENTS ONLY

"Subchapter 7.5 Unfair Claims Settlement Practices Regulations requires that our Company advise you that if you wish to take this matter up with the California Department of Insurance it maintains a Consumer Division in Los Angeles at 300 South Spring Street, Los Angeles, California 90013 or call 1-800-927-4357."

### FOR ALL OTHER STATES

This is to advise you that we have a grievance process in place. You may inquire into this process by calling 1-800-824-2726.